In re the MARRIAGE OF Robert J. SEFKOW, Petitioner, Appellant,

v.

Paula D. SEFKOW, Respondent.

No. CX–87–403.

Supreme Court of Minnesota.

July 15, 1988.

Charles R. Kennedy, and Sally I. Robertson, Wadena, for petitioner, appellant.

Wallace B. Goulet, Jr., and Cynthia Wagner Goulet, Grafton, N.D., for respondent.

Joanne Thatcher Swanson, Family Law Section, Minnesota State Bar Ass'n, St. Paul, amicus curiae.

AMDAHL, Chief Justice.

Appellant, Robert J. Sefkow, appeals from a court of appeals decision which reversed a trial court's determination of custody and awarded temporary maintenance, which had been denied by the trial court, to respondent, Paula D. Sefkow.

This marital dissolution proceeding is now in its fourth year and third appeal. Paula Sefkow appealed the original judgment and Decree of Dissolution, filed November 21, 1984, which awarded joint physical and legal custody of the parties' minor children but ordered a split residence arrangement. Minimal maintenance was provided. *Sefkow v. Sefkow*, 372 N.W.2d 37 (Minn.App.1985) (*Sefkow* I). The court of appeals reversed, and Robert J. Sefkow petitioned for further review of that decision.

In the meantime, this court decided *Pikula v. Pikula*, 374 N.W.2d 705 (Minn. 1985) and remanded *Sefkow* I to the court of appeals for further consideration in light of that decision. *Sefkow v. Sefkow*, 374 N.W.2d 733 (Minn.1985). The court of appeals, in turn, remanded the case to the trial court for determination of the custody of the older child. *Sefkow v. Sefkow*, 378 N.W.2d 72 (Minn.App.1985) (*Sefkow* II). Robert Sefkow's petition to include the younger child in the remand proceeding was denied.

Following a remand hearing in August 1986, the trial court awarded permanent physical custody of the older child to her father and modified the custody of the younger child to her father as well. Maintenance was denied.

Paula Sefkow appealed, and once again, the court of appeals reversed, ordering physical custody of both children to their mother and maintenance for a period of two years. *Sefkow v. Sefkow*, 413 N.W.2d 127 (Minn.App.1987) (*Sefkow* III).

We reverse the court of appeals' determination of the custody of the older child and the award of maintenance, and we affirm the decision not to modify the custody of the younger child.

Paula and Robert Sefkow were married on September 6, 1969, when both were students at the University of Minnesota. Upon graduation, Robert entered law school at the University of Wisconsin while Paula taught school to support them both.

The couple settled in Fergus Falls in 1974, where Robert began the practice of law and Paula obtained a teaching position. She also pursued a Master's Degree in gifted education which was substantially completed by the spring of 1979.

The parties are parents of two daughters, both adopted as infants. Laura Noelle was placed in the home in August 1979; Joanna Joy joined them in June 1982. Prior to the adoptions, the parties had agreed that both would share in the care of the children; the record shows that each did indeed take an active parenting role with both girls.

Paula resigned from her teaching position when Laura arrived and spent the next two years at home full-time with the infant. Robert's office was three blocks from the family home, and he often came home for lunch, as well as devoting evenings and weekends to the family.

In 1981, the parties mutually agreed that Laura would profit from the Montessori experience, and Paula spent six weeks acquiring that training. During that time, Paula's mother provided live-in babysitting for Laura while Robert was at work; the family spent weekends together. The following school year, when Laura was two, she was enrolled in the Montessori school in Fargo, North Dakota. Paula began an

internship in the same school at that time. Mother and daughter commuted the 50 miles to Fargo daily, spending evenings and weekends at home with Robert. Robert also assisted during the early morning hours as the family prepared for the upcoming day.

During the summer of 1982, Joanna Joy was placed in the Sefkow home. The entire family spent that summer at the parties' new lake home about 25 miles from Fergus Falls, within easy commuting distance for Robert. The following fall, Laura was again enrolled in the Montessori school in Fargo; baby Joanna stayed in Fergus Falls in the care of a babysitter during the day. Again, Robert shared the caretaking responsibilities of the children.

By the next summer, the Sefkow marriage began to crumble; it became apparent that divorce was imminent. On September 23, 1983, Robert picked up Joanna from the babysitter, and when Paula returned to the family home from the Fargo Montessori school with Laura, she was served with the Summons and Petition for Dissolution of Marriage.

Until December of that year, Laura and Paula continued to live in the family home; Joanna stayed with her father. In December the parties entered into a stipulation for temporary joint physical custody and joint legal custody. The children were with Paula from Saturday through Thursday and with Robert from Thursday afternoon through Saturday and one other evening during the week; although there were many exchanges between the parents, Laura and Joanna always stayed together.

On September 12–14, 1984, nearly a year after the initial separation, the case was tried, and on October 25, the trial court issued Findings of Fact, Conclusions of Law and Order for Judgment. The court found that "[b]oth parents are competent to be the custodial parent." Further, "[t]he parents have competent parenting skills, are attentive to the best interests of the children, have the capacity and disposition to provide the children with love, affection, and guidance, and can continue to educate and raise them." The court found

that Robert had been responsible for the day to day provision of the physical needs, while Paula had assumed a primary role in their education. While Robert was deemed to be a better choice for the sole custodial parent, the court awarded joint physical and joint legal custody of both girls, as defined in Minnesota Statutes § 518.003, subd. 3(b), (d) (1984). Laura's primary residence was designated with her father in Fergus Falls; Joanna's residence was designated with her mother in either Fergus Falls or the Fargo–Moorhead area, where she could attend the Fargo Montessori School. These living arrangements were made contingent on Paula's staying in the area. Liberal visitation between the parents was ordered.

Paula was awarded $1,000 per month as child support for Joanna. Spousal maintenance was denied, except for tuition and books, should Paula elect to pursue a Ph.D. Payments were limited to two years of full time academic studies, to be started within three years of the date of the Judgment and Decree and completed within five years of the initial matriculation date.

Paula appealed, and the court of appeals reversed. *Sefkow v. Sefkow*, 372 N.W.2d 37 (Minn.App.1985) (*Sefkow* I) The court of appeals found that "the trial court arbitrarily disregarded the mother's primary parenting role with each of the children." *Id.* at 43. Further, no support could be found in the findings for the award of split custody and the alternative award of sole custody to the father. *Id.* at 44. The court of appeals emphasized the trial court's findings that both parents had competent parenting skills, had the capacity to provide the children with love and guidance, and were competent to be the custodial parent.

The court of appeals noted that Laura had been with her mother almost constantly for four and one-half years, including the first two years of her life when Paula did not work outside the home in order to be with her child. *Id.* at 45. The court stated: "The trial court's findings erroneously omit the subject of Paula Sefkow's daily parenting role, except as to schooling,

and mention only the activities of respondent." *Id.*

The court of appeals further noted the statutory preference for allowing siblings to reside together. *Id.; see* Minn.Stat. § 518.17, subd. 1(c). Therefore, the judgment was modified to place both Sefkow children with Paula. The joint physical custody description of the trial court was recast in a traditional award of sole physical custody to Paula, subject to reasonable visitation rights of the father. *Id.* at 47.

The trial court's order had expressly conditioned Joanna's custody with Paula on her remaining in the Fergus Falls/Fargo area. Robert had expressed concern that Paula's prospective educational plans would take her some distance away; he contended that for that reason, she should not have custody. The court of appeals dismissed this claim as seriously disturbing the balanced scheme of law. "[U]nnecessary limits on movement of the family unit unlawfully interfere with the stable circumstances of a child." *Id.* at 46. Therefore, the residential restrictions placed on the Sefkow children were declared "unnecessary and unlawful" and were lifted. *Id.* at 47.

Second, the trial court did not support its order of child support with adequate findings on the needs and resources of the parties. The issue of child support was remanded to the trial court for further determination. *Id.* at 48.

Finally, the court of appeals found that the denial of spousal maintenance, other than tuition and books, was an abuse of discretion as well. *Id.* The court noted: "During this 15 year marriage, Robert Sefkow has pursued his career without interruption. Appellant's [Paula's] employment maintained the couple during respondent's [Robert's] three years in law school. Since 1979, Paula Sefkow has mixed her career plans with the family plan the couple chose to pursue. * * * Respondent's 1983 gross earnings were ten times the salary appellant enjoyed in 1984." *Id.* Therefore, the court of appeals also remanded the issue of spousal maintenance. "Absent credible findings demonstrating that appellant's reasonable needs are otherwise met, we conclude that she is presently entitled to maintenance benefits for a period of 60 months." *Id.* at 49.

Robert petitioned for further review in this court. In the meantime, *Pikula v. Pikula* was decided. 374 N.W.2d 705 (Minn.1985). We granted review for the limited purpose of remand to the court of appeals for reconsideration in light of the recent *Pikula* decision. *Sefkow v. Sefkow,* 374 N.W.2d 733 (Minn.1985).

The court of appeals, in turn, remanded the case to the trial court. *Sefkow v. Sefkow,* 378 N.W.2d 72 (Minn.App.1985) (*Sefkow* II). Although the court of appeals stressed that the *Sefkow* I court had used a primary-caretaker analysis in its earlier decision to award the physical custody of Laura to Paula, it acknowledged:

> Neither the trial court nor the parties * * * have had an opportunity to address this question with regard for the carefully defined substantive standards in *Pikula,* and the parties have not had an opportunity to present additional evidence that may bear on this determination.
>
> Accordingly, we conclude here, having regard for the procedure of remand introduced in *Pikula,* that the physical custody of the older child of the parties should be examined and redetermined by the trial court.

378 N.W.2d at 77.

In all other aspects, the prior decision of the court of appeals (*Sefkow* I) was affirmed. In neither *Sefkow* I nor *Sefkow* II was the custody of the younger child, Joanna, discussed. The latter opinion was filed on November 26, 1985. Yet another year had elapsed.

The remand trial was scheduled for the following August. Prior to the hearing, Paula was offered a new job in her area of expertise in Appleton, Wisconsin at a substantially higher salary than she had been receiving at the Montessori school in Fargo. On July 31, 1986, she filed a motion to change the residence of Laura and Joanna to another state. Robert responded with an Affidavit objecting to the Motion. He claimed that the Motion as to Laura was

premature, as her custody had not been fully adjudicated; further, he alleged that it was not in Joanna's best interests to move, because it would interfere with his visitation rights, she would be removed from her school, her friends and her extended family, and the proposed living situation in Wisconsin was questionable and uncertain. The request for removal was consolidated with the remand for determination of Laura's custody and spousal maintenance.

The hearing took place in mid-August 1986. Sixteen witnesses were called, including the parties themselves and Robert's second wife, Cheryl (whom he had married on February 22, 1985). Both Paula and Robert presented extensive testimony and other evidence of the caretaking role each had assumed during the marriage. The trial court interviewed both children. At the conclusion of the hearing, the trial court gave Paula permission to move to Wisconsin and to take Joanna with her. The court cautioned, however, that the move would be strictly on a temporary basis subject to a final decision. Insofar as the motion to change residence related to Laura, it was deemed untimely and therefore was dismissed.

The trial court summarized the interview with the children and noted that both girls loved both parents. While Laura would make no commitment about whom she would choose to live with, Joanna stated that she would prefer to reside with her dad. Finally, the trial court admonished Paula about making negative comments to the girls regarding their father.

Paula accepted the employment in Appleton and shortly thereafter moved to Wisconsin with Joanna. Laura stayed in Fergus Falls with her father, his second wife Cheryl, and Cheryl's teen-age daughter, Cristen. Paula remarried in November 1986.

No decision was forthcoming from the trial court for over 6 months. On Friday, February 6, 1987, Paula obtained a Writ of Mandamus from the court of appeals to compel the trial court to make a decision. On February 12, the trial court issued its order for judgment accompanied by 65 findings of fact and 8 conclusions of law.

Laura's custody was awarded to her father. The trial court went through each of the factors enunciated in *Pikula* to determine Laura's primary parent. Each finding was supported by specific reference to the original transcript and the remand testimony. The trial court determined that Robert had been the parent primarily responsible for the following *Pikula* factors (numbered as in *Pikula*, 374 N.W.2d at 713):

(1) preparing and planning of meals,

(2) bathing, grooming and dressing,

(4) medical care, including nursing and trips to physicians,

(5) arranging for social interaction among peers,

(6) arranging alternate care (babysitting),

(7) putting child to bed at night, attending to child in middle of night, waking child in morning.

The parents had been equally responsible for:

(3) purchasing, cleaning and care of clothes,

(8) disciplining (including general manners and toilet training),

(9) educating (religious, cultural, etc.).

Paula had been primarily responsible for *Pikula* factor (10), teaching elementary skills. The court concluded that Robert had been Laura's primary parent prior to the date of the couple's separation, September 23, 1983.

The trial court stressed the fact that Paula had not been a "traditional homemaker" during the marriage but had completed her education and then worked outside the home. The court also found that Paula and her mother had made negative comments about Robert in the children's presence, although both had denied doing so at the hearing.

The trial court then went on to find that Robert was also Laura's "psychological parent," the parent "with whom the child is most comfortable in describing her feel-

ings, emotions, worries, fears, concerns, and expressing herself most freely; and upon whom the child most relies."

Finally, the court analyzed each of the statutory factors describing the best interests of the child, pursuant to Minnesota Statutes Section 518.17, subdivision 1. Again, each finding was supported by reference to the testimony.

Laura had been residing with her father for nearly two years; she had lived in the same house in the same community all her life. She had attended the same school; her friends lived nearby. She had developed bonds with Robert's second wife, Cheryl, and Cheryl's daughter, as well as with Robert himself. The trial court concluded that it was in the best interests of Laura to remain in Fergus Falls in the custody of her father.

The court then turned its attention to Joanna. Both parties had acknowledged at the beginning of the hearing that the remand was limited to determination of Laura's custody. However, the trial court treated Robert's opposing affidavit to Paula's Motion to Change Residence as a Motion to Modify Joanna's Physical Custody, since Paula's move represented a substantial change in circumstances.

The trial court first justified its initial award of split custody of the children on the basis that at the time of separation, each had differing educational needs as well as differing physical needs. Nearly two years had elapsed since the original award, however, and now the trial court found that a split custody arrangement could "no longer be tolerated."

The trial court proceeded to go through each of the ten *Pikula* factors to determine Joanna's primary parent. As with Laura, each conclusion was supported by specific reference to the evidence. The court found that, as to Joanna, Robert had been primarily responsible for the same *Pikula* factors as with Laura. The parties had been equally responsible for the same factors as with Laura. But the court found that at the time of separation, teaching elementary skills (Factor 10) had not yet begun. The trial court concluded that Robert had been

Joanna's primary parent prior to the couple's separation.

As with Laura, the court analyzed Joanna's best interests pursuant to Minnesota Statutes Section 518.17, subdivision (1). The court concluded that it was in Joanna's best interests to reside with her father in Fergus Falls because of Paula's interference with the bond existing between Robert and Joanna, because in Appleton she would be regularly under the care of a babysitter, because she could readily adapt to a stable, continuous family unit with Robert, because her extended family was in the Fergus Falls area, because the circumstances in the family unit in Appleton were unknown, because of possible disruptions in Paula's family unit due to her marriage, because of Joanna's stated preference to reside with her father, and because the court had determined that Robert was Joanna's primary parent. Thus, the trial court found that Joanna's new environment in Appleton would endanger her emotional health and impair her emotional development; Joanna's physical custody was therefore modified by transfer to her father, effective immediately.

Paula was ordered to pay child support of $300 per month, a downward departure from the guidelines due to the disparity in the parties' incomes. Spousal maintenance was summarily dismissed: "Since the completion of the remand trial, the Respondent [Paula] has remarried. Spousal maintenance, therefore, is no longer an issue."

Once again, Paula appealed, and once again, the court of appeals reversed. *Sefkow v. Sefkow*, 413 N.W.2d 127 (Minn.App. 1987) (*Sefkow* III).

The court of appeals first determined that Robert had failed to establish endangerment of Joanna so as to warrant a change of custody. *Id.* at 131–32. Thus, her custody properly remained with her mother. The court of appeals then modified Laura's custody so that she, too, lived with Paula, thus avoiding a split custody arrangement. *Id.* at 133.

The court of appeals also reversed the denial of spousal maintenance and awarded

Paula $700 per month for the two-year period from the date of dissolution until her remarriage. This figure represented a compromise between the $1,000 figure requested by Paula and the $400 figure offered by Robert. *Id.* at 137.

Robert appealed to this court; the Family Law Section of the Minnesota State Bar Association requested amicus curiae status. Both petitions were granted.

### Custody of Laura Sefkow

The scope of review of an appellate court is narrowly defined. The function of the court of appeals is limited to identifying errors and then correcting them. *See* Introduction, Minnesota Court of Appeals, Internal Rules (1983); *see also* P. Popovich & D. Niles, *A Practitioner's Guide to Bringing an Appeal in the Minnesota Court of Appeals*, 11 Wm. Mitchell L.Rev. 627, 630 (1985).

We have criticized before the court of appeals' misapplication of the scope of review when it has usurped the role of the trial court by reweighing the evidence and finding its own facts: "Appellate review of custody determinations is limited to whether the trial court abused its discretion by making findings unsupported by the evidence or by improperly applying the law. *Weatherly v. Weatherly*, 330 N.W.2d 890 (Minn.1983); *Berndt v. Berndt*, 292 N.W. 2d 1 (Minn.1980). * * * [D]e novo review of the entire record * * * " is inappropriate. *Pikula v. Pikula*, 374 N.W.2d 705, 710 (Minn.1985).

Further, the "trial court's findings must be sustained unless clearly erroneous." *Id.* Deference must be given to the opportunity of the trial court to assess the credibility of. the witnesses. Minn.R.Civ.P. 52.01.

The trial court made voluminous findings on the physical custody of Laura Sefkow. Except for the finding on Laura's psychological parent, each finding was expressly supported by reference to the original trial and to the remand hearing. The testimony was long and often contradictory. But, the trial court explained its reasons for determining which witnesses were credible and which were not. Again and again, it justi-

fied a finding with the words, "Based on the credibility of the witnesses * * *." The trial court's role is to do exactly that.

■ The court of appeals in *Sefkow* III did not defer to the trial court, despite the extensive findings. Never did the court of appeals mention its appropriate role as a reviewing court. Rather, it echoed the earlier determination of the *Sefkow* I court when it found that the trial court had arbitrarily disregarded all evidence reflecting negatively on Robert and all evidence in favor of Paula, despite the extensive findings available after the remand hearing. 413 N.W.2d at 134.

The *Sefkow* III court then proceeded to review the record *de novo* and make its own decision. It concluded, on the basis of its interpretation of the evidence as a whole, that neither parent was Laura's primary caretaker. *Id.* at 135. The court then performed its own analysis of Laura's best interests, pursuant to Minnesota Statutes Section 518.17, subdivision 1, and granted physical custody of Laura to her mother. In effect, it tried the issue anew. We conclude that the court of appeals exceeded the scope of review.

Minnesota Statutes Section 518.17, subdivision 1 (1984) provides that, in custody determinations, the court shall consider the best interests of the child. The statute defines the "best interests of the child" as "all relevant factors" to be evaluated by the court, including:

(a) The wishes of the child's parent or parents as to his custody;

(b) The reasonable preference of the child, if the court deems the child to be of sufficient age to express preference;

(c) The interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interests;

(d) The child's adjustment to his home, school, and community;

(e) The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;

(f) The permanence, as a family unit, of the existing or proposed custodial home;

(g) The mental and physical health of all individuals involved;

(h) The capacity and disposition of the parties to give the child love, affection, and guidance, and to continue educating and raising the child in his culture and religion or creed, if any; and

(i) The child's cultural background.

Minn.Stat. § 518.17, subd. 1 (1984).

■ This court has embraced the primary parent or primary caretaker doctrine, which states that when both parents would be suitable custodians, the intimacy of the relationship between the primary parent and the child should not be disrupted if at all possible. *Berndt v. Berndt,* 292 N.W.2d 1, 2 (Minn.1980). We reasoned in *Berndt,* that the importance of stability in the life of a young child is paramount to ensure the child's sense of security, happiness, and adaptation. The relationship between the child and his or her primary parent most often provides that stability. Thus, separating a child from the primary parent could rarely be deemed to be in the child's best interests. *Id.*

We further refined the rule in *Pikula.* We stated: "[W]hen both parents seek custody of a child too young to express a preference, and one parent has been the primary caretaker of the child, custody should be awarded to the primary caretaker absent a showing that that parent is unfit to be the custodian." 374 N.W.2d at 712.

Recognizing that the statutory criteria are somewhat nebulous and often resist application, we attempted in *Pikula* to establish objective standards to determine which parent has been the primary caretaker:

[T]he trial court shall determine which parent has taken primary responsibility for, *inter alia,* the performance of the following caring and nurturing duties of a parent: (1) preparing and planning of meals; (2) bathing, grooming and dressing; (3) purchasing, cleaning, and care of clothes; (4) medical care, including nursing and trips to physicians; (5) arranging for social interaction among peers after school, i.e. transporting to friends' houses or, for example, to girl or boy scout meetings; (6) arranging alternative care, i.e. babysitting, day-care, etc.; (7) putting child to bed at night, attending to child in the middle of the night, waking child in the morning; (8) disciplining, i.e. teaching general manners and toilet training; (9) educating, i.e., religious, cultural, social, etc.; and, (10) teaching elementary skills, i.e., reading, writing and arithmetic.

*Id.* at 713 (quoting *Garska v. McCoy,* 167 W.Va. 59, 278 S.E.2d 357, 363 (1981)).

The primary caretaker was to be determined as of the separation of the parties. *Pikula,* 374 N.W.2d at 714. In this case, the trial court went through each of the ten *Pikula* factors and made a determination of the parent primarily responsible for each. Each finding was supported by specific reference to the record. The evidence clearly supported the trial court's conclusion that Robert was Laura's primary caretaker. It would have supported a conclusion that neither parent was the primary caretaker as well. And, it would have supported a conclusion that Paula was Laura's primary caretaker. But it is the role of the trial court to make that determination. The trial court concluded that Robert had been Laura's primary caretaker at the time the dissolution proceedings began.[1]

■ The court of appeals reversed on the basis that the trial court had improperly allowed post-separation evidence to influence its decision regarding Laura's best interests. *Sefkow III,* 413 N.W.2d at 134. Among Robert's witnesses were his second wife, Cheryl, Laura's first grade teacher, and a psychologist who had observed Robert's family unit a few weeks before. The

---

1. At oral argument, Paula's attorney discussed at length the refusal of the trial judge to recuse himself from the remand hearing, despite Paula's Affidavit of Prejudice. This issue was not addressed in the initial appeal; therefore it is improperly before this court, and we decline to discuss it.

trial court had reasoned that, in order to determine the interaction between Laura and these significant persons in her life, this testimony was relevant. Laura had lived in her father's home, with her step-mother, Cheryl, for a number of years. She had attended the entire first grade (and the entire second grade and now, the entire third grade) since the date of dissolution. We think that under the circumstances of this lengthy litigation over Laura's custody, the events of the past four and one-half years are not only relevant, but indeed are crucial in determining the child's best interests.

Furthermore, at Laura's present age, she is not too young to express a preference regarding her custody. Therefore, a *Pikula* analysis, which is limited to custody determinations of children too young to state a preference, simply no longer applies to Laura.

■ In *Pikula,* we perceived the primary caretaker doctrine as an extension and refinement of the statutory criteria to be used in determining the best interests of a young child. Noting that four of the nine criteria rest on the centrality of continuity of care and environment, we emphasized the importance of stability in custody determinations. *Pikula,* 374 N.W.2d at 711, n. 1. However, the statute mandates a multi-faceted inquiry into "all relevant factors," including psychological, emotional and spiritual aspects of the parenting role. Minn. Stat. § 518.17, subd. 1.

The trial court did exactly that. It determined that Robert was Laura's psychological parent. It analyzed the list of the statutory factors, once again supporting its findings with specific references to the record. Laura has spent the past three and one-half years in the custody of her father. She has lived her entire life in the same house in Fergus Falls. She has attended the same school; her friendships have developed around her Fergus Falls environment. Laura clearly loves her mother (in the interview of the children, she refused to choose between her parents), but she loves her father, too. She is apparently well-integrated into the home of Cheryl and Robert Sefkow. Her extended family lives in the immediate area.

The trial court concluded that it would be in Laura's best interests to remain with her father and supported that conclusion with extensive findings. We can find no abuse of discretion. We therefore reverse the court of appeals and reinstate the trial court's custody award placing Laura with her father, Robert Sefkow, subject to liberal visitation with her mother.

The court of appeals summed up this tragic situation when it stated: "The need for finality in fixing the permanent custody of the children is overwhelming under the protracted circumstances of this case." *Sefkow* III, 413 N.W.2d at 136. We lament this situation with its unconscionable delay as Laura's custody has been relitigated and appealed again and again.

The legislature has mandated that custody proceedings shall receive priority in being set for a hearing. Minn.Stat. § 518.168. The court of appeals has adopted a policy to expedite appeal of custody decisions.

■ We urge trial courts to bifurcate proceedings where custody is vigorously contested, deciding custody issues first and financial and other matters in a more relaxed manner. We agree with amicus Family Law Section of the Minnesota Bar Association, that once permanent physical and legal custody of minor children has been finalized, other decisions, such as maintenance and occupancy of the homestead, are often facilitated. We also believe that such bifurcation and expedient resolution will prevent a parent from manipulating the system to achieve personal goals which have little to do with the best interests of the child.

■ *Pikula* dictates that the primary parent of a very young child be determined as of the date of separation. Only if this date is reasonably close to the actual trial does the *Pikula* analysis have any viability. We further emphasize that it is truly in the best interests of the child to have permanent custody fixed as quickly as possible to avoid the limbo of a Laura Sefkow and to

furnish much-needed stability at this difficult time.

### Custody of Joanna Sefkow

The trial court originally awarded joint legal and joint physical custody of both Laura and Joanna. However, Joanna's primary residence was designated as with her mother. At that time, Joanna was two years old. Only Paula appealed.

The court of appeals reasoned that Paula was both children's primary caretaker. It modified the language of the original award to reflect the reality of the living situation of the parents. Refusing to comment on the viability of "joint physical custody" when the parties lived 50 miles apart, the court of appeals simply recast the language to a traditional award of sole physical custody to Paula, with reasonable visitation rights by the father. *Sefkow I*, 372 N.W.2d at 47.

This court granted Robert's petition for review of that custody decision for the limited purpose of remanding to the court of appeals for reconsideration of its decision in light of *Pikula*. *Sefkow v. Sefkow*, 374 N.W.2d 733 (Minn.1985). In turn, the court of appeals remanded the matter to the trial court but limited the remand to a determination of the older child, Laura. *Sefkow* II, 378 N.W.2d 72, 77 (Minn.App. 1985).

■ Robert's petition to this court to include Joanna in the remand was denied. This denial is not an adjudication or expression of opinion on the merits. *Murphy v. Milbank Mutual Insurance Co.*, 388 N.W. 2d 732, 739 (Minn.1986). The denial does, however, make the decision of the court of appeals binding on the lower court. Thus, the remand hearing was limited to a determination of Laura's custody. Joanna's primary parent and custody had already been determined; Paula had been designated as her sole physical custodian by the court of appeals in *Sefkow* I.

Indeed, the parties themselves acknowledged that the remand hearing was limited to determination of the physical custody of Laura. Paula's Motion to Change Residence, insofar as it concerned Joanna, was properly characterized as an "Auge Motion," a Motion to Modify Custody. *See Auge v. Auge*, 334 N.W.2d 393 (Minn.1983).

■ However, the trial court proceeded to undertake a primary caretaker analysis under *Pikula* for Joanna as well as Laura and concluded that Robert was Joanna's primary parent. The court of appeals reversed, declaring that this conclusion was not relevant to a motion for modification of custody brought three years after the initial custody determination. *Sefkow III*, 413 N.W.2d 132. We agree.

■ The trial court erred when it concluded that the determination of Laura's primary parent necessarily includes the determination of her sibling's primary parent. While one parent may well be the primary caretaker of all the children in a family, it is certainly possible for different children, especially if they are different ages, to have different primary caretakers. The rule in *Pikula* treats each child individually. *See Pikula*, 374 N.W.2d at 712 (enunciating the general rule that when one parent has been primary caretaker of a child too young to state a preference, custody should be awarded to that parent).

Joanna's primary parent was not at issue at the remand hearing. In making that determination, the trial court exceeded the scope of remand.

■ Modification proceedings are governed by Minnesota Statutes Section 518.-18, which provides that the court shall retain the custodian established by prior order. However, if a change has occurred in the circumstances of the child or custodian, and if modification is necessary to serve the best interests of the child, the court may order modification of custody if (1) the custodian agrees to the modification; (2) the child has been integrated into the family of the petitioner [the non-custodial parent] with the custodian's consent; or (3) the child's present environment endangers the child's physical or emotional health or impairs the child's emotional development and the harm likely to be caused by a change of

environment is outweighed by the advantages to the child. Minn.Stat. § 518.18(d).

A custodial parent's move out of state is clearly a change in circumstances, triggering the provisions of the statute. Since Paula neither agreed to the modification of Joanna's custody nor consented to her integration into Robert's family, the focus of the modification inquiry is on the third statutory factor: the child's present environment must endanger her physical or emotional health or development, and the harm likely to be caused by a change in that environment must be outweighed by the advantage of a change to the child.

Since denial of removal would effect a change in custody, we have construed the statute as establishing an implicit presumption that removal will be permitted, subject to the noncustodial parent's ability to establish that removal is not in the best interests of the child and that removal will endanger the child's physical or emotional health. *Auge*, 334 N.W.2d at 395. The burden of proof is on the party opposing the custody. *Id.* at 397.

We have extended the rule enunciated in *Auge*, which involved a parent who had sole physical and legal custody of a child, to the parent who has sole legal custody but joint physical custody. *Gordon v. Gordon*, 339 N.W.2d 269 (Minn.1983). Paula was awarded sole physical custody of Joanna by the *Sefkow* I court. The parties retained joint legal custody. Therefore, *Auge* and *Gordon* control.

The statute provides only one ground for denying permission to remove: "If the purpose of the move is to interfere with visitation rights given to the noncustodial parent by the decree, the court shall not permit the child's residence to be moved to another state." Minn.Stat. § 518.175, subd. 3.

It is undisputed that the purpose of Paula's move was to accept employment with the Appleton school system. At no time did she indicate that she intended to interfere with Robert's visitation rights. Therefore, a presumption that Paula would be able to remove Joanna was established,

subject to Robert's ability to establish that removal would not be in the best interests of the child.

The trial court, after undertaking a primary caretaker analysis under *Pikula* and going through each of the statutory factors to determine the best interests of the child, Joanna, stated:

> Because of the interference by Respondent [Paula] with the bond existing between Petitioner [Robert] and Joanna, because it places her in an environment where she will be regularly under the care of a babysitter and withdrawn from a family unit, because she can readily adapt to a stable, continuous family unit with Petitioner at Fergus Falls, Minnesota, because she has extended family in Minnesota and North Dakota, because the circumstances of the family unit she would reside with in Wisconsin are unknown, because it is likely that settlement in Appleton, Wisconsin, will be further disrupted by an anticipated change in Respondent's family unit, and because it is Joanna's preference that she reside with Petitioner and most importantly, because this court has found that Petitioner was the primary caretaker of Joanna, the court finds that Joanna's environment with Respondent at Appleton, Wisconsin, endangers her emotional health and will impair her emotional development.

The trial court concluded that Robert had met his burden of proof and modified Joanna's custody accordingly. The court of appeals reversed.

The court of appeals in *Sefkow* III, correctly observed that "rather than demonstrating the alleged dangers of permitting Joanna to move to Wisconsin with appellant [Paula], the findings focus on the alleged benefits of placing Joanna with respondent [Robert]." 413 N.W.2d at 132. We agree that the trial court's emphasis was misplaced.

The trial court readily admitted that the circumstances of the family unit in Wisconsin are unknown. Yet those very circumstances must be analyzed to overcome the

presumption in favor of Paula's continued custody.

The bond between Joanna and Paula, her custodial parent, was not mentioned in the trial court's findings at all. The harm caused by the separation of Joanna from the parent with whom she had lived nearly all her life was not even considered. We have stated that "the trial court must consider the negative effects of separating the child and the custodial parent." *Auge*, 334 N.W.2d at 399. The burden placed on the noncustodial parent in modification cases is a heavy one. We conclude that that burden was not met in this case. The trial court therefore abused its discretion in modifying Joanna's custody. We hold that the permanent physical custody of Joanna Sefkow should remain with her mother, Paula Sefkow, subject to liberal visitation with her father, and we affirm the court of appeals.

We recognize that this analysis leads to a split custody of the children. We regret this unfortunate arrangement, but we conclude that in this particular case, it is unavoidable. Throughout these proceedings, there has been a great deal of emphasis on the desirability of the children's remaining together. We do not favor split custody as a general rule; indeed we support the general policy that the best interests of minor children are usually served by permitting them to remain together. *See Schultz v. Schultz*, 266 Minn. 205, 208, 123 N.W.2d 118, 121 (1963); *Kennedy v. Kennedy*, 403 N.W.2d 892, 899 (Minn.App.1987); *see also* Minn.Stat. § 518.17, subd. 1.

■ However, the welfare of the child is paramount, and the decision to split custody is not conclusively erroneous. *Borchert v. Borchert*, 279 Minn. 16, 19–20, 154 N.W.2d 902, 905 (1967); *Schultz*, 266 Minn. at 208, 123 N.W.2d at 121; *see Sefkow* III, 413 N.W.2d at 140. (Nierengarten, J., dissenting). Under the circumstances of this case, we feel there is no alternative arrangement. Other factors, such as bonding to a parent and stability of the home environment, outweigh the need for Laura and Joanna to reside together.

We do not think that the split custody arrangement necessarily means that the sibling relationship between these girls will be destroyed. Prior to the trial court's decision after the remand hearing, Laura and Joanna lived apart but spent vacations and holidays, as well as frequent weekends, together as each visited her noncustodial parent. We foresee that arrangement continuing now. The continuity of the relationship need not be disturbed.

### Maintenance

■ The court of appeals, in *Sefkow* I, noted that the trial court had found that Paula was not "in need of maintenance." *Sefkow* I, 372 N.W.2d at 48. The *Sefkow* I court determined that such a finding was clearly erroneous as an abuse of discretion and directed the trial court to make a finding as to the amount of Paula's reasonable and necessary expenses. *Id.* at 49. The court of appeals concluded, "Absent credible findings demonstrating that appellant's [Paula's] reasonable needs are otherwise met, we conclude that she is presently entitled to maintenance benefits for a period of 60 months." *Id.* at 49.

Paula remarried in November 1986, shortly after the remand hearing, and the trial court summarily denied maintenance on this basis. The two-year period between the dissolution of the marriage in November 1984 and the date of Paula's second marriage in November 1986 was not addressed.

The *Sefkow* III court reversed the denial of maintenance. 413 N.W.2d at 136–37. The court of appeals acknowledged that Paula's need for maintenance had ended upon her remarriage (Minn.Stat. § 518.64, subd. 3) but found that she was due maintenance arrearages for two years.

Paula had requested $1,000 per month in maintenance; Robert offered $400. The court of appeals split the difference and awarded Paula $700 per month for two years, or $16,800.

Neither the trial court nor the court of appeals in *Sefkow* III used the proper criteria for determining spousal maintenance.

The statute governing the award of spousal maintenance provides, in pertinent part:

> In a proceeding for dissolution of marriage, * * * the court may grant a maintenance order for either spouse if it finds that the spouse seeking maintenance:
>
> (a) lacks sufficient property * * * to provide for reasonable needs of the spouse considering the standard of living established during the marriage, especially, but not limited to, a period of training or education, or
>
> (b) is unable to provide adequate self-support, after considering the standard of living established during the marriage and all relevant circumstances, through appropriate employment * * *.

Minn.Stat. § 518.552, subd. 1 (1986).

The statute goes on to list relevant factors to be considered in determining the period of time and the amount of maintenance. The list includes: (a) the financial resources of the party seeking the maintenance and the ability to meet needs independently; (b) the time necessary to acquire sufficient education or training to become fully or partially self-supporting; (c) the standard of living established during the marriage; (d) the duration of the marriage; (e) the loss of earnings and accompanying employment opportunities foregone during the marriage; (f) the age and physical and emotional conditions of the spouse seeking maintenance; (g) the ability of the spouse paying maintenance to meet needs while also meeting the needs of the spouse seeking maintenance; (h) the contribution of each party in the acquisition or appreciation in the amount or value of the marital property. Minn.Stat. § 518.552, subd. 2. Further, the court of appeals' directive in *Sefkow* I was clear: Paula must demonstrate that her expenses were not met by her spendable income. *Sefkow* I, 372 N.W. 2d at 49.

At the remand hearing, Paula presented a budget for herself and Joanna of about $2430 per month. That budget assumed a move to Appleton and included rent of $600. The budget also included $83 for Paula's school tuition and $200 for savings.

To offset her anticipated expenses, Paula's salary in Wisconsin would be $29,000 plus fringe benefits. The trial court applied the Wisconsin and federal tax tables and calculated her annual net income to be $22,041.00, or $1836.00 per month. In addition, she would receive $1000 per month child support for Joanna and $309 income from the ten percent interest on her unpaid property settlement from Robert. There is no evidence that Paula's expenses were not met by her income during the three months she lived in Wisconsin prior to her marriage.

We do not have evidence of Paula's expenses in Fargo prior to her move. However, based on her testimony at the remand hearing, we can assume that her expenses were the same except for a $150 rent reduction and somewhat lower utilities. We must also eliminate the $83 for Paula's anticipated tuition and the $200 for savings. Thus, Paula's expenses for the period following the dissolution that she resided in Fargo totalled approximately $1900 per month.

The record shows that Paula's annual salary at the Fargo Montessori school was $12,000. In addition, she received $1000 per month child support for Joanna and $309 as interest on the property settlement from Robert. Once again, Paula did not show that her living expenses exceeded her spendable income. Therefore, we hold that any award of maintenance is improper. The court of appeals' award of past maintenance is reversed.

### Child Support

Minnesota child support guidelines provide that a trial court may order a reasonable or necessary amount of child support from either or both parents. Minn. Stat. § 518.551, subd. 5.

Based on Paula's net salary of $1836.00, the guidelines provide for monthly child support for one child of $459.00. *Id.*

Robert testified at the remand hearing that his net monthly income totaled $4786.00 per month. The child support guidelines provide for monthly child support for one child of $1000, based on this

income. *Id.* (Support for an obligor with monthly income of $4001 or more shall be in same dollar amounts as provided in the guidelines for an obligor with a monthly income of $4000. For one child, this figure is 25% of $4000 or $1000.)

We hold that Robert Sefkow shall pay the sum of $541.00 per month to Paula Sefkow as child support. This amount represents the difference between child support for one child based on Robert's Sefkow's monthly income and child support for one child based on Paula Sefkow's monthly income, as provided in the child support guidelines. Visitation expenses shall be shared equally by the parties.

### Attorneys Fees

 In *Sefkow* I, the court of appeals ordered Robert to pay $17,000 toward Paula's attorneys fees. *Sefkow* I, 372 N.W.2d at 49–50. The trial court had awarded her $4,000 at the conclusion of the original trial.

In *Sefkow* III, the court of appeals, in response to Paula's request for attorneys fees, stated: "Appellant * * * has not demonstrated that she is unable to pay her own attorney so as to require an additional award of attorney fees." *Sefkow* III, 413 N.W.2d at 137.

Paula has requested an additional award of attorneys fees as a result of these remand and appeal proceedings from this court. The amount was left to our discretion.

In view of the disparate economic circumstances of the two parties and in view of the fact that the appeal here was only partially successful, we award Paula Sefkow $1500 as attorneys fees on the response to Robert Sefkow's appeal.

### Conclusion

We affirm the court of appeals in reversing the trial court's modification of the permanent physical custody of the child, Joanna. We reverse the court of appeals in awarding custody of the older child, Laura, to her mother, and we reinstate the trial court's award of permanent physical custody of Laura to her father. We reverse the court of appeals' award of a money judgment for back maintenance due Paula Sefkow, and we order that Robert Sefkow pay net child support to Paula Sefkow in the amount of $541 per month, based on the disparity in the parties' incomes. This amount is consistent with the guidelines set forth in Minnesota Statutes Section 518.-551, subdivision 5. Finally, we award respondent, Paula Sefkow, $1500 toward attorneys fees incurred in her response to this appeal.

POPOVICH, Justice, took no part in the consideration or decision of this case.