**In re the Marriage of Steven MAXFIELD, Petitioner, Respondent,**

v.

**Diane MAXFIELD, Appellant.**

No. C3-88-2343.

Court of Appeals of Minnesota.

May 9, 1989.

Review Granted July 12, 1989.

Jeffrey D. Pederson, Wadena, for petitioner, respondent.

Cheryl Schrenk, Northwest Minnesota Legal Services, Moorhead, for appellant.

Considered and decided by SHORT, P.J., and RANDALL and KALITOWSKI, JJ., without oral argument.

## OPINION

RANDALL, Judge.

This appeal challenges the trial court's award of sole physical and legal custody of four minor children to respondent Steven Maxfield. Appellant Diane Maxfield claims that the trial court erroneously discarded the primary caretaker rule when the court awarded custody of the parties' three younger children to respondent. Appellant also argues that the trial court erroneously credited the parties' oldest child with expressing a valid custodial preference. Additionally, appellant contends the trial court failed to divide the marital property in a fair and equitable manner. We reverse in part and remand.

## FACTS

Appellant and respondent were married on July 27, 1977, in Wilkes–Barre, Pennsylvania, appellant's hometown. The parties have four minor children. The names and dates of birth of the children are: Jeremiah Maxfield, born July 15, 1978; Aleshia Maxfield, born August 14, 1980; Therese Maxfield, born July 31, 1984; and Jacinta Maxfield, born July 10, 1986.

In 1984, the family settled in Verndale, Minnesota, respondent's hometown. Once settled in Verndale, respondent decided to use education benefits he had available through the military to obtain job skills. Respondent attended vocational school from August 1984 to May 1986.

While respondent attended vocational school, he spent a lot of time away from home. Subsequently, his employment placed great demands on his time. Respondent typically worked an eight to nine hour day and had a drive of approximately one hour both to and from work. Appellant was primarily responsible for the care of the family's children. She purchased the food, prepared the meals, washed the clothes, and fed and bathed the children. Appellant also attended the children's medical needs, got up to care for the children if they awoke during the middle of the night, and got them ready for bed. Both parents provided discipline for the children and, to a limited extent, respondent shared in the children's religious training.

During the family's three years in Verndale, the marriage began to break down. In February 1987, appellant asked respondent to leave the family's home. Respondent complied with appellant's wishes in April. Between April and July 1987, respondent and appellant stayed in contact with each other, and respondent was able to visit the children regularly. In June 1987, appellant informed respondent of her plan to move to Pennsylvania with the children.

When appellant and the four children first arrived in Pennsylvania, they stayed with appellant's mother. After a few weeks, they moved into a four-bedroom apartment in a low-income housing project. While appellant and the children were living in Pennsylvania, respondent had limited contact with the children. They visited with respondent over the Thanksgiving holiday in 1987 and had a two-week visit just before the trial.

After a few months of actual separation, respondent filed a petition for legal separation in Wadena County District Court on September 18, 1987. On March 30, 1988, respondent filed a motion requesting legal and physical custody of the children. Appellant filed an answer and counter-petition on April 11, 1988. Appellant sought dissolution of the marriage, legal and physical custody of the children, child support and maintenance, and an equitable distribution of the marital property.

Prior to trial, the court ordered custody studies. Studies were performed by the Luzerne County Children and Youth Services of Pennsylvania and the Wadena County Social Services of Minnesota. Both studies were entered into evidence at trial. The Luzerne County study indicated that appellant was providing a satisfactory home for the children. The trial court failed to mention in its findings of fact that the social worker who performed the study questioned the children about their custodial preference. The worker wrote:

> Because of their age, Therese and Jacinta could not express where they wanted to live. When worker spoke to Jeremiah and Aleshia, they readily stated that they want to stay with their mother. Although they miss their father, they do not want to live with him. They would be happier if they could visit with their dad in Wilkes–Barre more often.

The custody study performed by the Wadena County Social Services consisted of an interview with respondent. The social worker's report expressed concern about whether respondent would be able to adequately care for the children if he obtained custody. Additionally, the report questioned the adequacy of the home respondent planned to provide for the children. The Wadena report made no custodial recommendation.

The trial court did not appoint a guardian ad litem for the children. The record shows that the parties did not request one. The trial court did appoint Dr. Ralph Scheer, a psychologist active in the Wadena County guardian ad litem program, to interview Jeremiah and Aleshia before trial. Based on his interview with Aleshia, Scheer concluded that she was not mature enough to express a valid custodial preference.

With respect to Jeremiah, Dr. Scheer came to the opposite conclusion. Jeremiah, according to Dr. Scheer, was mature enough to express a valid preference. In their first meeting, Scheer asked Jeremiah a series of questions in an attempt to elicit a custodial preference.[1]

Dr. Scheer met with Jeremiah a second time, asked him the same questions, and got identical responses. According to Dr. Scheer, Jeremiah's responses seemed firmer at the second meeting. Dr. Scheer felt that Jeremiah was not choosing between his mother or father, but was choosing a lifestyle. Scheer believed Jeremiah preferred the small-town lifestyle of Verndale to the big city atmosphere of Wilkes–Barre.

On cross-examination, Dr. Scheer admitted that Jeremiah did not explicitly state a custodial preference. However, Dr. Scheer felt that the parental preference was a component of Jeremiah's preference for the Verndale area.

At trial, appellant testified about her future plans, which included marriage. After marriage, appellant intended to move the children from Wilkes–Barre to her fiance's six-bedroom home in rural Pennsylvania. The trial court found this prospect troubling because the court felt that the marriage and move introduced "an element of uncertainty and disequilibrium into the home setting and environment for the children."

1. Dr. Scheer testified:
 The first sort of formal question I asked was this: "Which teachers do you like better, at Wilkes–Barre or Verndale?" And his answer was at Verndale. Then I said "Which school do you like better?" And he said Verndale. * * * "Which church do you like better?" And he said "Verndale." * * * "Which house do you like better?" His answer was "Verndale." * * * Then I said "The Judge must consider many things when he decides where you will live and go to school, where shall I tell him that you wish to live?" And he said "Verndale."

At trial, respondent revealed his plans for the children. He stated that if granted custody, he would secure a live-in home-maker to help take care of the children. Additionally, his mother would help him care for the children in the morning and the evening. Respondent said that he leaves for work at 6:30 a.m. and does not return home until after 5:00 p.m. Based on the two weeks the children spent with respondent prior to the trial, the court found respondent able to provide for the needs of the children.

The trial court found that moving the children back to Minnesota from Pennsylvania would ultimately involve less change or disruption for the children. The court felt that appellant's impending marriage and a move to another home in Pennsylvania would introduce an element of uncertainty not present if the children were moved back to Minnesota to live with their father. The court came to this conclusion despite the fact that a move to Minnesota would terminate the children's relationship with their primary caretaker.

The trial court dissolved the marriage. With regard to custody, the court concluded that the primary parent presumption adopted in *Pikula v. Pikula*, 374 N.W.2d 705 (Minn.1985), did not apply in this case. The court reasoned that the presumption did not apply in the custody decision regarding the three younger children because too much time had elapsed between the initial separation and the date of trial. The court found the presumption inapplicable to a determination of Jeremiah's custody because Jeremiah expressed a valid custodial preference. After finding *Pikula* inapplicable, the court analyzed the factors set forth in Minn.Stat. § 518.17, subd. 1 (1986), and concluded that the best interests of all the children would be served by awarding respondent sole physical and legal custody.

The trial court's decision on the division of marital property paralleled the custody decision. The court awarded respondent both vehicles, most of the cooking utensils, and the gardening equipment. The bedroom furniture and other miscellaneous items of household property were given to appellant. The trial court viewed the decision on the vehicles and some household items as inextricably bound up with the custody determination.

## ISSUES

1. Did the trial court err by disregarding the primary caretaker presumption when making the custody decision for the children too young to express a custodial preference?

2. Did the trial court err by concluding that Jeremiah expressed a valid custodial preference?

3. Did the trial court divide the marital property in a fair and equitable manner?

## ANALYSIS

### Standard of Review

"Appellate review of custody determinations is limited to whether the trial court abused its discretion by making findings unsupported by the evidence or by improperly applying the law." *Sefkow v. Sefkow*, 427 N.W.2d 203, 210 (Minn.1988) (quoting *Weatherly v. Weatherly*, 330 N.W.2d 890 (Minn.1983); *Berndt v. Berndt*, 292 N.W. 2d 1 (Minn.1980)). Independent review of the record is inappropriate. *Pikula*, 374 N.W.2d at 710. The trial court's findings must be sustained unless clearly erroneous, and due deference must be given to the trial court's ability to assess witness credibility. *Sefkow*, 427 N.W.2d at 210 (citation omitted).

### I.

### Primary Parent Presumption

 Appellant contends that the trial court erred by disregarding the primary caretaker rule when making the custody decision regarding Aleshia, Therese, and Jacinta. The trial court found that these children were either too young or immature to express a valid custodial preference. The trial court also found that appellant was the children's primary parent as of the date of separation, but nonetheless refused to apply the primary parent doctrine based on language in *Sefkow* concerning the

length of time between separation of the parents and the actual dissolution trial.

The Minnesota Supreme Court has recognized the importance of retaining the intimacy of the relationship between the primary parent and child. *Pikula*, 374 N.W.2d at 711–13. Because that relationship is so important, the court adopted the following rule:

[W]hen both parents seek custody of a child too young to express a preference, and one parent has been the primary caretaker of the child, custody should be awarded to the primary caretaker absent a showing that that parent is unfit to be the custodian.

*Id.* at 712. The rule is premised on the significance of emotional and psychological stability in a child's development which is primarily "provided by and through the child's relationship to his or her primary caretaker * * *." *Id.* at 711.

There was no attempt to introduce evidence at trial to show that appellant was unfit to be the children's custodian. The trial court simply refused to apply the primary caretaker rule when making the custody decision on the three younger children because the court found that too much time had passed between the date of initial separation and the date of trial. The trial court relied on *Sefkow* for its conclusion that *Pikula* did not apply here. Appellant argues that the trial court read *Sefkow* too broadly, and that the trial court failed to recognize critical distinctions between her case and *Sefkow*. An examination of *Sefkow* supports appellant's position. Here, appellant has *always* been the children's primary caretaker. The only change that occurred following separation is that appellant became the children's *only* caretaker. *Sefkow* went off on an entirely different issue. The *Sefkow* court found that the interaction between the parents and child between the date of the separation and the actual trial was relevant to the question of custody, due to the length of time that had passed and the changes in physical custody that had occurred. Thus, the court concluded, cutting off examination of each parent's interaction with the child at the date of separation would not have served the child's best interests.

Under *Pikula*, the primary parent is established as of the date the parties separate, so the parent without the physical custody between separation and trial is not prejudiced. Also, the parent with temporary physical custody prior to trial is not allowed to "build a case" by arguing that "I must be the primary parent as I had sole physical custody of the children the last few months." *Sefkow* merely pointed out that there are cases when it is not advisable to cut off considerations of primary parent at the date of separation.

In *Sefkow*, more than four and one-half years elapsed between the initial separation and final disposition of the case. *Sefkow*, 427 N.W.2d at 212. Furthermore, the trial court did not perform the primary caretaker analysis until three and one-half years after the initial separation. *Id.* at 206–08. It was in this context that the supreme court stated:

Only if this date [the date of separation] is reasonably close to the actual trial does the *Pikula* analysis have any viability.

*Id.* at 212.

In that factual setting, a primary caretaker analysis as of the date of separation was found to be counter productive to custody determination. On our facts, the *Pikula* rule is the logical, common sense approach. Appellant was the primary caretaker up to the time of separation and continued on as such in Pennsylvania. Also, little more than one year elapsed between the date appellant and respondent separated and the trial. This is significantly less than the three and one-half years that passed between the initial separation and the date the primary caretaker analysis was performed in *Sefkow*. *Id.* at 206–08. Since the children have remained in appellant's care throughout these proceedings, no post-separation events undermine the validity of the *Pikula* analysis.[2]

2. We recognize that since August respondent has been the children's primary parent. This

Since continuity of care with the primary caretaker is "crucial to the best interest of the child," *Pikula*, 374 N.W.2d at 712, and there are no circumstances present in this case which justify discarding the *Pikula* presumption, we hold that the trial court erred by refusing to apply the *Pikula* rule. Therefore, we reverse the trial court's decision to award custody of Aleshia, Therese, and Jacinta to respondent and award custody of these children to appellant.[3]

## II.

### Jeremiah's Custody

■ The trial court found that Jeremiah expressed a valid custodial preference, therefore, the *Pikula* presumption did not apply. The primary caretaker rule is inapplicable when a child is mature enough to express a valid custodial preference. *Pikula*, 374 N.W.2d at 713. The evidence supports the conclusion that Jeremiah is old enough to express a preference. Appellant contends that Jeremiah did not clearly and unequivocally state a *custodial* preference, thus the trial court erred by relying on Jeremiah's statement of geographical preference to award custody to respondent.

■ The trial court relied solely on Dr. Scheer's testimony for the conclusion that Jeremiah expressed a valid custodial preference. Dr. Scheer's testimony revealed that Jeremiah expressed a preference for life in Verndale. Dr. Scheer concluded that Jeremiah understood that life in Verndale meant life without his mother. The trial court accepted Dr. Scheer's conclusion even though Jeremiah did not actually say he would prefer to live with his father.

Appellant contends that the evidence does not support the conclusion that Jeremiah expressed a custodial preference. Appellant argues that this same question was addressed in *Johnson v. Johnson*, 424 N.W.2d 85 (Minn.Ct.App.1988). In *Johnson*, a child custody case, the oldest child stated "that he might like to live with his father if his mother moved away from Red Wing." *Id.* at 88. The trial court found this statement to be a valid custodial preference. However, this court concluded that the statement could not be characterized as a definite custodial preference. The court stated:

> What he did express to the trial judge was a definite preference to remain in Red Wing, which is substantially different than indicating that he clearly and unequivocally wished to stay with his father.

*Id.* Based on *Johnson*, appellant claims the trial court's conclusion that Jeremiah expressed a custodial preference is erroneous.

Further support for appellant's claim that Jeremiah's statement was not a custodial preference is found in the Luzerne County study. According to that study, which is not disputed, both Jeremiah and Aleshia expressed a distinct *custodial* preference for appellant. The trial court failed to mention this preference in its findings of fact or conclusions of law. This prior unequivocal custodial preference casts further doubt on the court's characterization of Jeremiah's preference for Verndale as a custodial preference.

Based on *Johnson* and Jeremiah's prior unequivocal statement of custodial preference for his mother, we hold that the trial court erred by concluding that Jeremiah

change was caused by the trial court's erroneous decision to discard the primary caretaker rule. Therefore, the change in physical custody does not alter our analysis.

3. The trial court analyzed the factors contained in Minn.Stat. § 518.17, subd. 1 (1986), to determine which custody decision would be in the best interests of the children. This analysis was premised on the erroneous conclusion, at least with regard to the three younger children, that the *Pikula* rule did not apply.
Our examination of the trial court's findings reveals that the trial court's failure to consider

the importance of the primary caretaker's role when conducting the best interests analysis affected the court's conclusions on subdivisions 1(c), (d), (e), (f), and (h). Re-examination of these factors, giving proper weight to the primary caretaker presumption, supports our holding that awarding custody of the younger children to appellant is in the children's best interests. *See, e.g., Johnson v. Johnson*, 424 N.W.2d 85, 89 (Minn.Ct.App.1988) (failure to consider important role of primary caretaker when conducting best interest analysis requires reversal).

expressed a custodial preference for his father. Too much emphasis was placed on his preference for the Verndale area. *See Johnson,* 424 N.W.2d at 88; *see also Imdieke v. Imdieke,* 411 N.W.2d 241, 242 (Minn.Ct.App.1987), *pet. for rev. denied* (Minn. Oct. 30, 1987) (*custodial* preference of minor child is one factor to consider in custody decision, but it is not necessarily determinative). Therefore, we reverse the trial court's decision on Jeremiah's custody. Since the evidence demonstrates that Jeremiah is capable of expressing a custodial preference, we remand the issue of his custody to the trial court for redetermination.

■ On remand, the trial court should appoint an independent guardian ad litem for Jeremiah. On the particularly sensitive issue of child custody and splitting minor brothers and sisters, Jeremiah should have someone to look out for his best interests. We realize that the parties did not feel an independent guardian was necessary in this case. We do. Therefore, the trial court should appoint a guardian ad litem to insure that Jeremiah is given an opportunity to discuss his custodial preference in a relaxed atmosphere.

The trial court must make the custody decision that is in Jeremiah's best interest. In making this determination, the following points may be helpful. First, the Minnesota Supreme Court has stated that as a general rule "the best interests of minor children are usually served by permitting them to remain together." *Sefkow,* 427 N.W.2d at 215; *see also Imdieke,* 411 N.W. 2d at 242 ("Split custody decisions are frowned on in Minnesota."). Second, the supreme court has determined that it is a rare case in which a child's best interests will be served by separating the child from his or her primary caretaker. *Pikula,* 374 N.W.2d at 711; *see also Smith v. Smith,* 425 N.W.2d 854, 857 (Minn.Ct.App.1988).

### III.

*Property Division and Child Support*

Appellant contends that the trial court did not divide the marital assets in a fair and equitable manner, pursuant to Minn. Stat. § 518.58 (1986). Appellate court re-

view of property divisions is limited in scope. When a marriage is dissolved, the "trial court has broad discretion in dividing marital property." *Servin v. Servin,* 345 N.W.2d 754, 758 (Minn.1984). "Its decision will be overturned only for a clear abuse of discretion." *Id.* at 758.

■ The trial court awarded both vehicles to respondent because the court viewed the property division as dependent upon the custody decision. The trial court stated that the transportation needs of the children suggest that the Ford Grenada should be awarded to the parent who obtains custodial responsibility for the children. We agree and hold that the Ford Grenada should be awarded to appellant. She will now have custodial responsibility for at least three, and possibly all the children, and she is entitled to one of the two cars. With regard to the other items of personal property, we remand to the trial court for reconsideration based on the change in custody.

We also remand the issue of child support to the trial court. Initially, the trial court reserved this issue. In light of our decision, the court will be required to award support to appellant from respondent in accordance with Minn.Stat. § 518.551 (1986). If the court determines that Jeremiah should remain with his father, the court should compute an equitable offset to provide for appellant's reasonable share of Jeremiah's support.

### DECISION

The trial court erred by disregarding the primary caretaker presumption when making the custody decision for Aleshia, Therese, and Jacinta. The trial court erroneously concluded that Jeremiah expressed a valid custodial preference. The trial court must re-evaluate the property division in light of our disposition of the custody issue. The issue of child support must be considered on remand.

Reversed in part and remanded.