[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case comes to this court as a fully contested dissolution of marriage. CT Page 573
The plaintiff and defendant were married on May 14, 1980 and have been separate and apart since approximately August of 1991. The defendant (hereinafter called the wife or mother), is 38 years old and the plaintiff (hereinafter called the husband or father), is 39 years old. There are two minor children who have been born of the marriage. Rommel Rakeem born April 15, 1980 and Raphael Tyrrell born January 27, 1988.
Neither the husband nor the wife completed high school in the ordinary course. The wife, however, did obtain thereafter her high school equivalency diploma. The husband is in good health. The wife has bone and joint problems and is currently awaiting a decision on her claim for a social security disability.
The parties, by their pleadings and testimony and claims for relief agree that they should have joint legal custody of the oldest son Rommel with physical residence with the plaintiff father. While both parties agree on joint legal custody of the younger son Raphael, there is disagreement as to his primary physical residence. The father has requested that both children have their physical residence with him and that extensive and liberal rights of visitation be granted to the mother. The mother requests that Raphael's physical residence be with her allowing liberal visitation to the father.
The court heard the parties' evidence and received their simultaneous briefs approximately November 17, 1992.
The briefs were requested by the court to address the issue of split custody. The court was concerned whether the court had the power to separate children and if so, under what circumstances should it do so.
1. The Standard for Determining Custody in Connecticut
In Connecticut the court is guided by the best interest of the child in making custody orders. Connecticut General Statutes 46b-56(b) provides as follows:
 "In making or modifying any order with respect to custody or visitation, the court shall be guided by the best interests of the child, giving consideration to the wishes of the child if he is of sufficient age and capable of forming an intelligent preference, provided in making the initial order the court may take into CT Page 574 consideration the causes for dissolution of the marriage or legal separation if such cause are relevant in a determination of the best interests of the child."
The statute also provides that the court shall give consideration to the wishes of a child of sufficient maturity and to the causes for the dissolution of the marriage if such causes are relevant to the best interest of the child's determination. The statute makes no provision that the court avoid separating siblings or only doing so under certain circumstances. There are no Connecticut court decisions that have formerly established any standards for or against split custody. Therefore, whether custody should be split in a particular case, is a factor that may be considered along with other non-mandatory factors in determining what is in the best interest of the child. The custody of each child must undergo a best interest analysis and that what may be the best for one sibling may not necessarily be what is in the best interest of the other sibling.
II. Split Custody
"Split custody" has been defined to refer to arrangements where one parent has sole, legal and physical custody of one or more children and the other parent has sole, legal and physical custody of the remaining children. See, 8 Rutkin. Effron and Hogan, Connecticut Practice Bk. 41.10 at p. 162 (1991). However, some courts have also used the term to refer to a situation where the parties disagree as to split physical custody although they agree to joint legal custody. Split legal custody is not the issue here, as both parents agree that they should have joint legal custody of both children. What the parents in this case disagree about is whether there should be split physical custody of the two children.
In an attempt to assist the court, the attorney for the mother has cited the case of Montanaro v. Montanaro, FA87-0088610 for the proposition that split custody is recognized in Connecticut. The court has reviewed the Montanaro case and finds that after the court took into consideration the testimony of the parties and their expert witnesses, Judge Hauser found that both children were flourishing despite their separation and ordered that the status quo of separate custody with each parent be maintained.
In a divorce involving more than one child, the court has the power and discretion to separate the children by awarding them to CT Page 575 different custodians. 24 Am.Jur.2d, Divorce, 991 (1983). Such awards have been upheld by Appellate Courts, McDonald v. McDonald, 821 S.W.2d 458 (Tex.App. 1992). The reluctance to separate siblings is prompted by the desire to avoid severing the emotional ties between these children. In several states the interest in keeping children of broken homes together has resulted in the adoption of specific standards that must be met prior to allowing siblings to be separated. In Iowa for instance, it must appear that the separation "may better promote the long range interest of the children." In Re Marriage of Kurth,438 N.W.2d 852, 854 (Iowa App. 1989). In South Dakota and Pennsylvania there must be "compelling reasons". Schmidt v. Schmidt, 444, N.W.2d 367, 370 (S.D. 1989). In that situation, a fourteen year old boy's preference and bad influence of certain friends where he lived held to be sufficiently compelling to separate him from two brothers ages 11 and 9. In McAnallen v. McAnallen, 446 A.2d 918,923 (Pa.Super. 1982), there were two sisters involved, two and one-half years apart in age who were thriving though living separately. The Appellate Court reversed the trial court that ordered the children together.
Courts have ordered separate custody of siblings where the children have been living apart, each with a different parent for some time prior to the decree and each child was doing well, so that there was no valid reason to disturb such established relationships. In Sefko v. Sefko, 427 N.W.2d 203 (Minn. 1988), the court split custody of sisters awarding primary physical custody of the five year old daughter to the father and the two year daughter to the mother because it considered that the factors such as bonding to the parent and stability of home environment were more important than the need for the sisters to live together. At the time of the initial trial the sisters had been living apart for one year each with the parent who ultimately was awarded custody. The court stressed the importance of parental stability in the life of a young child. See also, M.D. v. B.D., 336 Pa. Super. 298,485 A.2d 813 (1984) (the children were living separately for almost two years). Wallace v. Wallace, 420 So.2d 1326
(La.App. 1982) (children living separately for fourteen months). In Davis v. Davis, 280 Md. 119, 372 A.2d 231, cert. denied, 434 U.S. 939 (1977), the court upheld split custody where the youngest child had resided for two years with the mother while the older brother and sister with the father. The court stated that "[a]ny adjustment by the children that was necessary has been made, and now they seem to have come to terms with the family situation." 372 A.2d at 236. CT Page 576
Split custody has been approved where the age difference between the siblings is five years or more, and the siblings have different interests and activities. In Griggs v. Griggs, 707 S.W.2d 488
(No. App. 1986), the appellate court affirmed the trial court's decree in awarding the twelve year old girl to the mother and the seven year old boy to the father, despite a rule that siblings should not be separated except in "exceptional circumstances". In Grace v. Grace, 221 Neb. 695, 380 N.W.2d 280
(1986), the appellate court found that there was no error in awarding custody of the thirteen year old boy to the father and the six year old boy to the mother. The court noted that at this time in their lives, a seven year age difference was a substantial age difference. In Re Marriage of Bainer, 27 Or. App. 703, 556 P.2d 1377,1378 (1978) (the thirteen year old half sibling was separated from six and eight year old children). The court stated, "The older child will soon be following interests as a teenager quite different from those of the two younger children." In Schmidt v. Schmidt, 444 N.W.2d 367 (S.D. 1989) the court found "compelling reasons" for separating a fourteen year old boy from his eleven and nine year old brothers. The court described these reasons as follows:
 [T]he evidence indicated that split custody would not be harmful to the boys' relationship. David was entering high school in the fall, while his bothers were both in grade school. David testified that the brothers got along but he did not share many activities with his younger brothers. The court may properly consider age differences and different interests in determining whether compelling reasons exist. (citation omitted). More importantly, David and his brothers will be within one-half hour of each other and spend the summer months together. The arrangement may provide as much quality time together as before. Id. at 370.
In the LaChapelle matter, both the mother and father live in Norwalk, Connecticut, about a five minutes ride from each other. The mother has recently moved with Raphael into a three room apartment on the main floor of a three family house with a large backyard and a porch. The father lives with Rakeem in the lower apartment of a home which belongs to the paternal grandparents who also live in the house. Raphael and Rakeem are eight years in age apart. The visitation arrangement during the fifteen month separation provides twenty-six out of thirty days opportunity for CT Page 577 the siblings to be together. The pendente lite orders which have been in place for over a year provide that the father shall have visitation with Raphael each Monday, Wednesday and Friday from 5:00 p.m. to 8:00 p.m. and the third week-end of each month from 5:00 p.m. on Friday until 8:00 p.m on Sunday. The mother has visitation with Rakeem each Tuesday and Thursday from 4:30 p.m. to 8:00 p.m. and on the first week-end of each month from 5:00 p.m. on Friday until 8:00 p.m. on Sunday. The visitation schedule enables the children to see each other five days a week, plus two week-ends of every month. (See mediation report attached)
In the instant case, the court heard from two experts. The first expert was Ms. Lacey Bernier of the Family Relations Office in Stamford, to whom the matter of compiling a report was referred by the Honorable Barbara A. Coppeto on June 3, 1992. During the course of the proceedings, Raphael was represented by Attorney Sari Jaffe as his attorney. The wife presented expert testimony through Dr. Roy A. Nisenson, Ph.D. of New Canaan. Judge Novack ordered that a custody evaluation be performed by a psychologist to be chosen by Attorney Jaffe, the attorney for the minor child if the husband's insurance covered the cost and if such a study could be completed by the then trial date schedule for August of 1992. Dr. Nisenson was chosen by Attorney Jaffe. It is fair to say therefore, that both experts started out as neutral investigators who were meeting these parties for the first time with no predetermined agendas or loyalties. Ms. Bernier recommended that the parents have joint legal custody of Raphael. She further recommended that the primary residence of Raphael as well as Rommel be with their father. Dr. Nisenson whose focus was only Raphael, indicated that the parties should have joint custody of Raphael and that Raphael's primary physical residence be with his mother.
Both of the experts are abundantly qualified. Both of the reports were admitted into evidence. The report of Ms. Bernier was Plaintiff's Exhibit 6 and the report of Dr. Nisenson was Defendant's Exhibit U. Dr. Nisenson met with the mother and father and the sons. He also conferred with Ms. Bernier; a School Resource Teacher, Sandy Johnson; a psychotherapist, Laurie Elkins; Victoria Esposito an acquaintance;, Marlene Morrison, Raphael's preschool teacher; Eva Peters an ex-sister-in-law; Mr. LaChapelle; Susan Ruther, her child was in the same preschool class as Raphael; Dr. Henry Rubenstein, Mrs. LaChapelle's orthopedist and Mary H. Craig a medical secretary and friend of Mr. LaChapelle and his parents. Dr. Nisenson lays out in his report his interviews with the parents. He also described the parents joint visits with CT Page 578 Raphael. He described Raphael as happy and animated in the presence of both parents and gave the doctor the impression of loving and being loved by mother and father equally. He observed the son have a snack and some juice with his mother and he seemed relaxed and comfortable with her. At times he was quiet and the doctor indicated that it was the quiet of calm that he observed. When asked about his desire to remain with his mother or to move in with his daddy, he stated that he preferred to stay with his mother.
During the visit with Doctor Nisenson of the father, Raphael was there with the older brother Rommel. The doctor agreed that it was a good idea to meet Rommel and it was clear that the three LaChapelle males bonded closely and warmly and enjoyed one another's company. When asked in the presence of Mr. LaChapelle and Rommel, who he would prefer to live with, Raphael said he would prefer to live with his father. Doctor Nisenson contacted eight people in doing his evaluation. He spoke to parties on both sides of the issue.
Marlene Morrison was interviewed by Doctor Nisenson. She reported "Raphael is very attached to his mother and there is no reason to believe that he should be separated from her. I visited the home of the mother a number of times during the school year and she did all things a mother should do and there was absolutely no neglect whatsoever." She further indicated to Doctor Nisenson in his report that the mother took care of him and he was always dressed well and medically cared for by the mother.
Victoria Esposito was interviewed by Doctor Nisenson. She described the mother as "a careful mother who wanted to make sure that it was alright before giving her son permission to eat at somebody else's home."
A Susan Ruther was interviewed and her child attended the same preschool class as Raphael. She described Mrs. LaChapelle as good to Raphael and even somewhat overprotective. She found her to be "very devoted and always came on the school trips."
Eva Peters was interviewed by Doctor Nisenson. She was familiar with the father's living situation. She was not complementary of the father's parents. She affirmed that she saw Raphael during the separation several times a week and that he was in good health, cared for and always taken to the doctor and dentist when necessary by his mother. CT Page 579
Sandy Johnson was interviewed by doctor Nisenson. She is a teacher at the Roton Middle School. She gave input concerning Rommel. He also spoke to one, Laurie Elkins who is on the staff of the Mid-Fairfield Child Guidance Center, and was involved in Rommel's referral for psychotherapy by his school social worker.
Doctor Nisenson indicates in his evaluation as set forth in Exhibit U, that considerable disruption has occurred in the family and that both children have been affected by the separation and divorce action. Doctor Nisenson's conclusion was that Rommel has an easy going and comfortable relationship with his father. Separating Rommel from his father, uncle and grandparents at this late post-therapy date, he determined would be inappropriate. The doctor indicated that Rommel "had soured" on his mother and wishes to remain with his father.
Doctor Nisenson found Raphael on the other hand, and his behavior with his mother, as very comfortable, relaxed and easy. He found that Raphael loves his brother, father, grandparents and uncle very much. His animation with them may come in part from his genuine love and in addition the excitement of the added pleasures and gifts and fun that he is able to have at the larger more attractive home of his grandparents. The doctor indicated, at a deeper level, it is felt that he should not be separated from his mother. Mrs. LaChapelle is very committed to Raphael and will be able to provide a moderating influence in his up-bringing regarding the more expressive gifts, toys and clothes available through his father. Furthermore, it is felt that Raphael needs his mother at age four and one-half and that he should continue to live with her in the deep hope that Mr. LaChapelle and his family will give support to this notion "however incredulous this might read" so that Raphael will pick up one and only one message and that is: "We all love you. You'll be living with me and it is OK with us and we will see you all the time." The doctor went on further to say "part of Raphael's confusion and concern may very well be that he is getting the message from his father, his brother, and his grandparents that he should live with them and this exacerbates the conflict all the more. It is understandable therefore, that he told the evaluator that he wanted to live with each of them. Mrs. LaChapelle struck this evaluator as deeply committed to her son Raphael and concerned about his well-being and this was corroborated by more sources than not." Doctor Nisenson went on to say it is this evaluator's reasoned belief after distilling the above information, that overall it would be best to maintain the CT Page 580 split family arrangement so that Raphael can continue to remain with his mother and Rommel can continue to remain in an environment where he would be comfortable. In this way, if over the years Raphael proved to need therapy the way his brother had once indicated a need for it, Mrs. LaChapelle could make arrangements for him to have it and hopefully to continue the therapy so that it would not be interrupted prematurely, again, that is if it were ever necessary. He indicated though the boys need and love one another deeply, they will have separate experiences regardless because of their age difference. Furthermore, they are indeed able to see one another throughout the week due to the proximity of both homes.
It was Doctor Nisenson's recommendation that the parents have joint custody of Raphael. His primary physical residence would be with his mother Mrs. Gwendolyn LaChapelle. This court accepts that recommendation and makes that an order of the court. Doctor Nisenson also recommended that the court provide for frequent and easy access to his father's home on a regular weekly basis and on some week-ends as well. Similarly, vacations both during the year and summer should be liberally spent in his father's domicile. Accordingly, the court orders the continuation of the pendente lite visitation.
This court finds that it does have the power to order split custody and does so under the circumstances of this case for all the foregoing reasons. The court finds that sufficient evidence has been introduced proving that it would be in Raphael's best interest to continue to live with his mother.
Accordingly, this court grants joint legal custody of both children to the parties. The court awards physical custody of Raphael to the mother and physical custody of Rakeem to the father. The existing visitation schedule to which the family has become accustomed, shall be as set forth in the pendente lite orders.
In addition to the temporary orders, the court makes the following orders:
1. During the summer vacation, Rommel Rakeem shall spend two nonconsecutive weeks with the mother. Raphael shall spend two other nonconsecutive weeks with the father if the father is also on vacation from his job during those weeks.
2. All holidays and birthdays of each child and each parent CT Page 581 shall be planned so that the parents have the ability to celebrate the occasion with each child for a portion of that day. The children will be with the mother on Mother's Day and with the father on Father's Day.
3. Each parent shall be able to telephone each of the children daily at reasonable hours, including during the summer vacation time.
The court in making the foregoing orders has taken into consideration all the statutory criteria in 46b-56 the best interest of the children. Neither of the parties may permanently remove either of the children from the state without further order of the court. This order is made in order to make sure that the sibling bond will endure.
Mrs. LaChapelle has not been gainfully employed during most of her marriage. Her health problems she claims, has made it difficult for her to work in addition to raising the children.
Mr. LaChapelle is a dispatcher for the City of Norwalk. In 1990 his annual salary was $30,490 but with overtime, he grossed $47,958.58. In 1991, his annual salary was $32,162.50, but with overtime he grossed $51,901.00.
For the first six months of 1992 he grossed $22,822.49 since there was less overtime. In 1992, so far he averaged approximately 10 hours a week overtime compared to 15 hours a week overtime in 1991 and 1990. Mr. LaChapelle's salary since July 1, 1992 is $34,594 per annum. He is paid $16.56 per hour. He is paid $24.85 per hour for overtime work done at time and one-half. He is paid $33.13 for overtime work which qualifies as double time.
This court has listened to the witnesses in the case and reviewed all the exhibits. In addition, the court has taken into the consideration all the statutory criteria set forth in 46b-81, the assignment of property and transfer of title statute, 46b-82
the alimony statute, and 46b-62 the attorney's fees statute. In addition, the court has considered 46b-84 the child support statute and the child support guidelines and the criteria and deviation criteria set forth therein. In addition, the court has considered all the evidence introduced in the case and has reviewed the parties financial affidavits, listened to the arguments of counsel and reviewed the extensive claims for relief, in addition to the calculations concerning child support guidelines and the tax CT Page 582 consequences of the orders along with the affidavit re: counsel fees. The followings orders are entered:
1. A dissolution of marriage is granted on the grounds of irretrievable breakdown.
2. The court has reviewed the child support guideline computations based on the husband's affidavit of August 28th that in addition to his gross weekly income of $662.72 he had gross of $190.00 of overtime for a total gross income of $852.72. The court finds that the computation done which shows that the child support should be under those circumstances, $298 is an appropriate computation. Accordingly, based on the split custody adjustment as set forth on the child support guidelines computation, child support is ordered for Raphael to be paid by the father to the mother in the sum of $150 per week. (See worksheets attached)
3. The wife is totally dependent on the husband for her support. She receives $13.25 worth of food stamps weekly and does not work.
The husband shall pay to the wife as alimony until the death of either party, the wife's remarriage or her cohabitation under the statute, the sum of $150 per week. If the wife goes to work or receives social security benefits, the parties are first to attempt to renegotiate the payments. If they cannot, they shall then attempt to mediate the new payments with the Family Relations Division of the court. Thereafter, either of the parties may petition the court for relief. This court will consider the receipt by the wife of social security benefits or income from work a substantial change of circumstances.
4. An immediate wage withholding order shall be granted.
5. The husband shall provide medical, hospitalization and dental insurance for the parties minor children including psychological or psychiatric counseling and shall pay all medical, hospitalization and dental expenses not covered by insurance provided they are medically necessary and the charges incurred are fair and reasonable.
6. The husband shall maintain medical, hospitalization and dental insurance coverage for the wife through his employment at his cost and expense for one year from the date of this decree. The wife shall have her COBRA rights and she shall pay the premium CT Page 583 herself after the first year.
7. The provisions of Connecticut General Statutes 46b-84c shall apply so that the wife can apply directly to the husband's insurer for reimbursement of medical, hospital and dental expenses.
8. The husband has the right once a year to choose among various medical health coverage plans. He shall for a period of one year from the date of this decision, choose a health plan for the wife that does not restrict her to a list of approved doctors, but allows her to choose her own doctor so that she can have knee surgery and oral dental treatment and surgery performed respectively by her physician and dentist.
9. The husband and wife shall each be responsible for his or her own debts, except that the husband shall pay the approximate sum of $140 owed to dentists Doctor Spilagyi and Doctor D'Agosto. In the event the wife has paid these bills or has to pay them herself, the husband is to reimburse her.
10. The parties have previously divided their personal property except as set forth on Schedule B attached hereto and Schedule C attached hereto. The parties agree that these matters are to be referred to Family Relations for binding arbitration-mediation. The court makes that an order since the parties agree to be bound accordingly.
11. Each party shall keep the other advised of any changes in his or her address and telephone number, promptly share medical and counseling reports, report cards or other reports about scholastic progress of a child who resides with that spouse and give advance notice of school conferences and significant events to the other spouse.
12. Each spouse shall notify the other promptly in case of serious injury or hospitalization of a child while that child is with that spouse.
13. Each party shall, by May 1, of each year, provide the other party with a copy of his or her filed income tax return for that year. If no tax return has been filed by May 1 of a particular year by a party, then that party may supply his or her W2 Form for that year by May 1 and supplement that with his or her tax return when it is filed. CT Page 584
The wife is to immediately notify the husband when she receives social security benefits if any. The wife is to immediately notify the husband when she is employed if at all. Notification shall include the name and location of the job or benefit received and the amount received.
14. The husband shall name Rommel Rakeem LaChapelle and Raphael LaChapelle as the sole, equal, irrevocable beneficiaries of the death benefits under his Norwalk City Employee's pension plan until Rommel reaches the age of eighteen. Then Raphael will remain as the sole irrevocable beneficiary until he reaches the age of eighteen, but the husband may elect to retain Rommel as a co-equal beneficiary. If he so chooses, then Raphael shall be a one-half beneficiary.
15. Attorney Sari B. Jaffe was appointed as attorney for the minor child, Raphael LaChapelle on June 8, 1992. She has spent 43.25 hours on the matter and her hourly rate is $175. As part of her argument for fees, she indicated she was looking for at least $100 per hour. The court accordingly finds that her attorney's fees in the sum of $4,325 are fair and reasonable. The court orders the parties, the mother and father to be equally responsible for those attorney's fees.
How and in what fashion attorney Jaffe will be paid will be first discussed by attorney Jaffe with the parties. Thereafter, if they are unable to work out an arrangement she shall seek mediation of these fees with the Family Relations Division of the court. Attorney Jaffe has already indicated in open court that she recognizes that the payment from Mrs. LaChapelle will take a substantial period of time. If attorney Jaffe is unable to have worked out the fees after the above have been discussed, then she may petition the court for relief.
The court notes in passing, that attorney Jaffe has exhibited the highest tradition of the bar in taking on a case of this complexity considering not only the law, but the personality of the parties involved. The court is also aware of the fact that Attorney Jaffe had to recognize on coming into this case that the likelihood of immediate or even relatively quick payment of these fees was remote.
16. The court is aware of the cases that discuss nonprofit organizations and the award of counsel fees to those organizations. The court has re-reviewed Benavides v. Benavides, 11 Conn. App. 150
CT Page 585 and has considered the statutory criteria under 46b-62. The court finds that the fees claimed by Attorney Siegel of the Connecticut Legal Services in the approximate sum of $23,125 is fair and reasonable. The court finds that the husband-father under the Koizim, and the cases that followed thereafter, and the statutory criteria set forth in 46b-62 and the court's previous orders for payment of the attorney fees for the child, is not financially able to make a contribution towards those attorney's fees. The court finds that Mr. LaChapelle does not have the financial ability to make a contribution towards the attorney's fees.
17. The husband is to continue to make payments on the arrearage which at the time of the trial was in the approximate sum of $925 at the rate of $15 per week. If the parties cannot stipulate as to the amount of the arrearage as of the date of this decision, the matter is referred to Family Relations for mediation to determine the amount of arrearage and report back to the court.
18. Mr. LaChapelle is fully vested in a retirement plan which is the Norwalk City Employees' Pension Plan. The benefits consist of 2% of his final salary multiplied by his years of service to a maximum of 30 years. Mr. LaChapelle has the option of retiring as early age 55. He will then have worked the required ten years and his amount will be reduced. Mr. LaChapelle works for a municipality. Governmental Plans are exempt for ERISA. Thus, this Plan is not subject to a QDRO and it will remain the sole and exclusive property of the husband. The court has taken this into consideration in making its other orders.
19. All of the assets of the parties not expressly addressed herein shall be the property of the party who shows its ownership on his or her financial affidavit. All other debts not addressed herein shall be the sole responsibility of the parties who shows the debt on his or her financial affidavit.
20. The parties shall consult with one another on major issues in their children's lives. If consultation does not produce an agreement after an exchange of views and exploration of alternatives, the parties shall seek the advice of the Family Relations Division of the court as a mediator. The parties also may seek out any mediator they mutually agree on. If mediation does not produce an agreement, the person with primary physical possession shall have the final decision making power except that either party may petition the court for relief if they are not able to work out the matters after mediation. The parties shall be CT Page 586 required to meet with the mediator prior to bringing any motions for contempt or modification.
21. All other claims for relief not expressly addressed herein, have been rejected by this court.
KARAZIN, J.
Page 1 STATE OF CONNECTICUT Appendix C
 CHILD SUPPORT GUIDELINES WORKSHEET ----------------------------------
Gwen LaChapelle Erwin Rommel LaChapelle 10/29/92 — ---------------- ------------------------- ---------- CUSTODIAL PARENT NONCUSTODIAL PARENT DATE
FA 91-0119704S D.N./CASE NO. ________ NUMBER OF CHILDREN 2 AGE OF OLDEST CHILD 12
Custodial Noncustodial ------------------------------------------------------------------ Net Income Determination ------------------------
1. Gross Income (attach verification) $ _________ $ 852.72
2. Number of deductions for tax purposes __________ 4
3. Federal Income Tax $ _________ $ 84.00
4. Social Security Tax $ _________ $ 52.87
5. Retirement Plan Deductions $ _________ $ 18.22
6. Union Dues or Fees $ _________ $ 5.50
7. State Inc. Tax $ _________ $ 15.45
8. Health Insurance Premiums $ _________ $ 0
9. Medicare Tax $ _________ $ 12.36
10. Other Child Support Orders $ _________ $ _______ CT Page 587
11. Sum of Lines 3 — 10 $ _________ $ 188.40
12. Net Income (Line 1 minus Line 11) $ _________ $ 664.32
------------------------------------------------------------------ Tentative Obligations ---------------------
13. Combined Weekly Net Income (nearest $10.00) $ 664.32
14. Total Child Support (from schedule) $ 298.00
15. % Share of Line 13 (each parent) ________% 100.00%
16. Tentative Obligations (Line 14 times $ _______ $ 298.00 Line 15) (If slit custody adjustment required, proceed to next section; otherwise, enter these amounts on Line 23)
------------------------------------------------------------------
Page 2 STATE OF CONNECTICUT Appendix C (cont'd.)
 CHILD SUPPORT GUIDELINES WORKSHEET ----------------------------------
------------------------------------------------------------------ Split Custody Adjustment ------------------------
17. % of Children Residing With Other ________ 1 Parent
18. Total % of Children 2
19. Line 16 times Line 17 $ _______ $ 298.00
20. Line 19 divided by Line 18 $ _______ $ 149.00
21. Larger Line 20 amount minus smaller Line 20 $ 149.00 amount (Enter on Line 23 for Parent Named on Line 22) CT Page 588
22. Parent Responsible for Line 21 amount Erwin Rommel LaChapelle
------------------------------------------------------------------ Actual Child Support Obligations --------------------------------
23. Adjusted Tentative Obligation $ _______ $ 149.00
24. Line 12 minus $135.00 $ _______ $ 529.32
25. Child Support Obligations $ _______ $ 149.00 (Lesser of Lines 23 and 24)
------------------------------------------------------------------ Order Summary -------------
26. Additional Amount for Spousal Support $ 200.00 or Caretaker Expenses
27. Other Costs/Needs/Expenses (Specify)
 $15 a week on child support arrearage of $925 $ 15.00 Payments started on 2/14/92, balance after After arrearage payment of 10/30/92 = $355.00 paid off $ ______
28. Total Weekly Support Order $ 364.00 $349.00 (Sum of Lines 25 — 27)
29. Retained Income (Line 12 minus Line 28) $ 300.32 $315.00 ------------------------------------------------------------------ Deviation ---------
30. Reasons for Deviation from Guidelines Amount
______________________________________________________________
______________________________________________________________
I hereby certify that a copy of the foregoing has been sent, postage prepaid on 10/30/, 1992, to all counsel and parties of record. CT Page 589
 ------------------------- Claudine Siegel
====================================================================
 FAMILY DIVISION FAMILY SERVICES UNIT SUPERIOR COURT
 MEDIATION REPORT ----------------
Docket Number FA91-011-97-04S Date Assigned NOVEMBER 12, 1992
Plaintiff ERWING LaCHAPELLE Atty. for Plaintiff SHERI PAIGE
vs.
Defendant GWENDOLYN LaCHAPELLE Atty. for Defendant CLAUDINE SIEGEL
Children ROMMEL RAQUEEM Atty. for Children ---
RAPHAEL TYRRELL Date December 20, 1991
 Requested by the Honorable BARBARA COPPETO ----------------------------- Judge of the Superior Court
___ Issues Not Resolved, Matter referred within Family Services Unit for evaluation.
___ Issues Not Resolved, Matter referred to Court.
X Issues Resolved. (Agreement Below)
--------------------------------------------------------------------
The parties in the above-referenced matter participated in the Family Services Mediation Program and agreed to the following parenting plan for their minor children, Rommel Raqueen LaChapelle (d.o.b. 4/15/80), and Raphael Tyrell LaChapelle (d.o.b. 1/27/88):
1. The children will continue their present living arrangement, i.e. Rommel will continue to reside in his father's home, Raphael will continue to reside with his mother. CT Page 590
2. Raphael will spend each Monday, Wednesday and Friday afternoon with his father. visitation will begin at 5:00 p.m. and conclude at 8:00 p.m.
3. Raphael will spend the third weekend of each month with his father. Visitation will begin at 5:00 p.m. on Friday. The child will be returned to his mother at 8:00 p.m. on Sunday evening.
4. Rommell will spend the each Tuesday and Thursday afternoon with his mother. Visitation will begin at 4:30 p.m. and end at 8:00 p.m.
5. Rommell will spend the first weekend of each month with his mother. Visitation will begin at 4:30 p.m. on Friday and conclude at 8:00 p.m. on Sunday evening.
6. The parties have agreed that the children will be with their father on Christmas Eve and Christmas Day until 2:00 p.m.
--------------------------------------------------------------------
LaChapelle vs. LaChapelle Mediation Agreement
7. On Christmas Day, the children will be picked up by their mother at 2:00 p.m. She will return Rommel to his father's home at approximately 8:30 p.m. Time allowance will be made for travel conditions.
8. The parties have agreed to refrain from "bad-mouthing" each other or their respective families, especially in the presence of their children.
9. The parties have agreed to meet for a second mediation session on January 29, 1992 at 3:30 p.m.
Respectfully submitted,
J. Michael Hull Florence M. Retter, M.S. Family Services Counselor Family Services Counselor
JMH/edj
==================================================================== CT Page 591
LaChapelle v. LaChapelle
SCHEDULE "B"
1. Curtains — beige lace that were in living room on 3 windows.
2. Beige lace sham in the living room over big picture window
3. Rose pink curtains that were in master bedroom.
4. Curtain rods for curtains and for sham
5. Two glass lamps with gold rimmed bases and beige shades.
6. Triple dresser with round mirror with shelves in bedroom, including all articles on it, including my jewelry box and all jewelry in it and single strand pearl necklace in velvety pouch and hand mirror.
7. Recent school picture of Rakeem.
8. Wife's two photo albums, one beige and one blue with photographs that were in them.
9. Wide-brimmed black and white Sunday hat
10. Wife's Christmas tree ornaments (at least 2 dozen)
11. Whole set of white with silver rim dishes and cups
12. Wooden cheese board and accompanying knife
13. Gravy bowl and accompanying spoon
14. Four orange white pots and pan which wife had prior to marriage
15. Beige with brown rim corning ware plate from wife's mother;
16. Blue coffee mug with white lines going around.
17. Hammer given by wife's mother
18. Glass cake plate — present from Mary LaChapelle CT Page 592
19. One tall clear glass vase given by wife's brother.
20. Three crystal bowls which used to be in living room and given by wife's mother.
21. Potted plant that is in front of downstairs glass door of house in beige pot.
22. Sewing basket with material in it, sewing machine beige and pink cover.
23. All albums and records that belong to wife (box full of 45's and about 50 albums)
24. All VCR tapes which have recorded TV shows and all VCR tapes that were gifts from Rommel to Gwen, about a dozen, including the following:
 Jedi, Look Who's Talking, I'm Going To Get You Sucka, Houseparty, Pretty Woman, Beulah's Day Off, Dick Tracy, Dirty Dancing, Mannequin
25. Exercise bike
26. Easter Basket with red paper
27. 2 large Oriental floor throw pillows
28. Ceiling fan (gold and brown)
29. Green leather chair with wooden arms.
30. 4 wine glasses
31. 4 champagne glasses with black stems
32. Battery operated musical keyboard (white)
LaChapelle: Personal Property
SCHEDULE "C" — ITEMS ROMMEL LACHAPELLE IS KEEPING
Master Bedroom
1. One king size bed with headboard and mirror CT Page 593
2. Sheets, spreads and blankets
3. One tall four-drawer dresser
4. Rug Oriental — Green
5. TV
6. One table for TV
7. Blue curtains
Rommel's Room
8. Two bunk beds
9. Sheets and blankets
10. Rug
11. Toys
12. TV
13. Nintendo and other games
14. Computer
15. Blue curtains
Living Room
16. Colonial blue couch
17. Two gold chairs
18. Two end tables
19. One gold rim white table
20. One marble coffee table
21. One glass centerpiece with turntable, receiver glasses CT Page 594
22. Fish tank with fish
23. Set of dishes
24. Rug
25. 2 gold rimmed lamps
26. Curtains on both doors and picture window
27. Hutch with dishes and glasses
Kitchen
28. Washing machine
29. Microwave
30. Set of flatware
31. Glasses, plates
32. Big turkey dish
33. Pots
34. Bathroom towels and washcloths
Workplace
35. Two tall tree plants
Other Property
36. Harley-Davidson Motorcycle
37. 1986 Ford Mustang