*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0457**

In re the Marriage of:

Jacob Anthony Pulsifer, petitioner,
Respondent,

vs.

Julie Ann Pulsifer,
Appellant.

**Filed December 28, 2015
Affirmed
Klaphake, Judge***

Kandiyohi County District Court
File No. 34-FA-13-254

Theresa J. Patock, Jones & Patock, P.A., Willmar, Minnesota (for respondent)

Jon C. Saunders, Sarah L. Klaassen, Griffin R. Leitch, Casey J. Swansson, Anderson Larson Saunders & Klaassen, P.L.L.P., Willmar, Minnesota (for appellant)

Considered and decided by Rodenberg, Presiding Judge; Reilly, Judge; and

Klaphake, Judge.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**UNPUBLISHED OPINION**

**KLAPHAKE**, Judge

On appeal from the dissolution of her marriage, appellant challenges the district court's conclusions that (1) annual gifts she received from her mother constituted marital property, (2) income should be imputed to her for the purposes of child support based on her voluntary unemployment, and (3) it was not in the best interests of the parties' children to award her additional parenting time. We affirm.

## DECISION

### I. Annual Gifts

Appellant Julie Iverson-Pulsifer argues on appeal that gifts totaling $27,000 that she received from her mother, Carol Iverson, in 2012 and 2013 were nonmarital property. "Whether property is marital or nonmarital is a question of law, but a reviewing court must defer to the [district] court's underlying findings of fact." *Olsen v. Olsen*, 562 N.W.2d 797, 800 (Minn. 1997); *see also Baker v. Baker*, 753 N.W.2d 644, 649 (Minn. 2008) ("[Appellate courts] independently review the issue of whether property is marital or nonmarital, giving deference to the district court's findings of fact."). Appellate courts may find the district court's decision to be clearly erroneous if they "are left with the definite and firm conviction that a mistake has been made, . . . notwithstanding the existence of evidence to support such findings." *Olsen*, 562 N.W.2d at 800 (quotation omitted).

Marital property includes property acquired by either spouse "at any time during the existence of the marriage relation between them." Minn. Stat. § 518.003, subd. 3b (2014).

2

"All property acquired by either spouse subsequent to the marriage . . . is presumed to be marital property regardless of whether title is held individually or by the spouses in a form of co-ownership . . . ." *Id.* To rebut the presumption that property is marital, "a party must demonstrate by a preponderance of the evidence that the property is nonmarital." *Olsen*, 562 N.W.2d at 800. Nonmarital property includes "property real or personal, acquired by either spouse before, during, or after the existence of their marriage, which . . . is acquired as a gift, bequest, devise or inheritance made by a third party to one but not to the other spouse." Minn. Stat. § 518.003, subd. 3b. "For nonmarital property to maintain its nonmarital status, it must either be kept separate from marital property or, if commingled with marital property, be readily traceable." *Olsen*, 562 N.W.2d at 800. "Whether a nonmarital interest has been traced is . . . a question of fact." *Kerr v. Kerr*, 770 N.W.2d 567, 571 (Minn. App. 2009).

Appellant argues that the district court clearly erred by concluding that the annual gifts from Ms. Iverson were marital property. "The most important factor in determining whether a gift is marital or nonmarital is the donor's intent." *Olsen*, 562 N.W.2d at 800. The donor's intent is a question of fact and "is demonstrated by the surrounding circumstances." *Id.*

The district court found that the annual gifts from Ms. Iverson were intended to "avoid tax liability, but at the same time to assist the family unit as a whole." This finding is supported by evidence in the record. When asked whether it had been her understanding that the amounts she gave to her children each year were the maximum allowable, Ms. Iverson testified, "[i]t was, that's what they told me." In addition, Ms. Iverson testified

3

that her children's spouses "knew that [she] was putting [the checks] in their name[s] because [she] could only give so much to [each] child. This was a way of getting double the amount to [her] child[ren] through their spouse[s] and [the spouses] understood that." While Ms. Iverson testified that she "didn't specify" how the parties should spend the money and that she "would never dictate how [the parties] should spend their money," she also testified that, when she gave the gifts, she was "hoping [the parties would] pay down their mortgage." Moreover, respondent Jacob Pulsifer testified that

> each year [Ms. Iverson] gave the maximum or close to the maximum so we didn't have to pay taxes on it. . . . [Ms. Iverson] wanted to see her kids' families enjoy the inheritance so . . . she was giving the inheritance now versus after she passed so [certain receipts are for] gift checks to us.

Based on this testimony, the district court did not clearly err in concluding that the gifts "were not meant as non-marital gifts to each [party] individually" and that "[the gifts] were meant to avoid tax liability, but at the same time to assist the family unit as a whole." Thus, we affirm the district court's conclusion that the gifts were marital property.

## II. Imputed Income

Appellant next argues that the district court clearly erred by imputing income to her for purposes of child support after finding that she was voluntarily unemployed. "Whether a parent is voluntarily unemployed is a finding of fact, which [appellate courts] review for clear error." *Welsh v. Welsh*, 775 N.W.2d 364, 370 (Minn. App. 2009) (citing *Putz v. Putz*, 645 N.W.2d 343, 352 (Minn. 2002) (concluding that magistrate abused his discretion by making the clearly erroneous finding that the father was not voluntarily unemployed)). "A finding is clearly erroneous if the reviewing court is left with the definite and firm

4

conviction that a mistake has been made." *Vangsness v. Vangsness*, 607 N.W.2d 468, 472 (Minn. App. 2000) (quotations omitted). "[A]ppellate courts defer to [district] court credibility determinations." *Id.*; *see also* Minn. R. Civ. P. 52.01 (providing that "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses"); *Sefkow v. Sefkow*, 427 N.W.2d 203, 210 (Minn. 1988) ("Deference must be given to the opportunity of the trial court to assess the credibility of the witnesses.").

To determine a parent's basic child-support obligation, the district court must determine the gross income of each parent. Minn. Stat. § 518A.34(b) (2014). A parent's gross income includes his or her potential income. Minn. Stat. § 518A.29(a) (2014). Child support must be based on a determination of potential income "[i]f a parent is voluntarily unemployed, underemployed, or employed on a less than full-time basis." Minn. Stat. § 518A.32, subd. 1 (2014). For this determination, "it is rebuttably presumed that a parent can be gainfully employed on a full-time basis." *Id.* A parent can rebut this presumption by showing that "the unemployment, underemployment, or employment on a less than full-time basis is because a parent is physically or mentally incapacitated." *Id.*, subd. 3 (2014). Accordingly, it was appellant's burden to rebut the presumption that she could be employed on a full-time basis by showing that her unemployment was due to her mental incapacitation. *See id.*

Appellant argues that her claim that she was unable to work due to mental incapacitation was supported by her testimony concerning her disability, as well as the case notes and letter from her doctor, who recommended appellant be placed on leave from her employment. Appellant argues that the district court erred in rejecting the doctor's case

5

notes and letter because respondent did not object to the introduction of that evidence; the doctor's recommendations were based on his training and experience and not solely appellant's statements to him concerning her symptoms; and the court placed an improper burden on appellant to demonstrate the existence of her mental incapacity as it is "common knowledge" that, due to the "inherent character of mental illness, . . . medical practitioners rely extensively on the input of patients as to their symptoms."

The district court considered appellant's evidence and "d[id] not believe that [appellant's] claim that she is unable to work [wa]s credible." The court noted appellant's "statements, voice inflection, . . . body language and . . . positions" and concluded that "she wishes to hurt [respondent] in any way she can." In addition, the court indicated that appellant did not claim that she was disabled until the trial, "leaving [respondent] with no opportunity to request independent verification." The district court also considered appellant's testimony regarding her disability and did not find it to be credible because her testimony was "extremely vague and often conclusory." The district court indicated that "[o]ne of the few things that [appellant] stated clearly was that her mental illness was caused by stress related to the divorce. She presented no evidence or clear testimony to show that she would be unable to return to work a short time after the conclusion of this matter."

Additionally, the only medical evidence appellant submitted to the court was the case notes and letter completed by her doctor for the purposes of appellant's request for leave of employment. The court discredited these reports because they were "based solely on what [appellant] told [the physicians she chose and paid]." The court was not persuaded

6

that appellant was unable to work due to any mental incapacity because it was "provided only [appellant's] testimony, without any verification through testing or independent examination."

Appellant argues that the district court erred in discrediting the doctor's reports because "[the doctor]'s medical notes reveal that his medical opinions were not *solely* based upon [appellant's] statements, but were also based upon [his] interpretation of [appellant's] statements in light of [his] training and experience." In support of this argument, appellant relies on this court's decision in *Ingram v. Syverson*, 674 N.W.2d 233 (Minn. App. 2004), *review denied* (Minn. Apr. 20, 2004). In *Ingram*, the district court granted summary judgment on a personal-injury claim on the basis that the plaintiff's expert medical testimony lacked adequate factual foundation. 674 N.W.2d at 235. The plaintiff's doctor admitted on cross examination that he was unable to causally connect the plaintiff's injuries to the accident solely from his own findings and examination, but rather had relied on the plaintiff's statements that her pain resulted from the accident. *Id.* This court reversed the district court's grant of summary judgment because the doctor's testimony "derives not only from statements made by his patient, but also from his education, training, and experience as a practitioner," and therefore the doctor could "form an opinion as to the legitimacy of [the plaintiff's] statements about her pain, and could rationally relate her symptoms to the accident." *Id.* at 236-37.

There is a significant difference between this case and *Ingram*. While the plaintiff in *Ingram* offered the doctor's testimony as to her injuries, appellant here did not offer any medical testimony at trial. As respondent notes, appellant relied solely on the doctor's

reports, which were completed for the purpose of obtaining leave from her employment. Respondent had no opportunity to cross-examine appellant's doctor or therapist, and the district court had no opportunity to assess the credibility of the doctor or therapist.

The district court here concluded: "In view of the totality of the circumstances of this case, and after being able to see and hear the parties and the witnesses, the Court has determined that [appellant] is, and has been, capable of working at her job." Given the deference due the district court's credibility determinations and appellant's failure to submit sufficient evidence to satisfy her burden of showing that she was mentally incapacitated and therefore not voluntarily unemployed, the district court did not clearly err in finding that appellant is voluntarily unemployed. Thus, we affirm the district court's order imputing income to appellant for the purposes of child support.

## III. Additional Parenting Time

Lastly, appellant argues that the district court erred in denying her request for additional parenting time with the parties' children because the court failed to make particularized findings of fact in regard to the children's best interests. "Appellate courts recognize that a district court has broad discretion to decide parenting-time questions and will not reverse a parenting-time decision unless the district court abused its discretion by misapplying the law or by relying on findings of fact that are not supported by the record." *Suleski v. Rupe*, 855 N.W.2d 330, 334 (Minn. App. 2014) (citations omitted). "On appeal, findings of fact are accepted unless they are clearly erroneous." *Id.* (citing Minn. R. Civ. P. 52.01; *Griffin v. Van Griffin*, 267 N.W.2d 733, 735 (Minn. 1978)).

Under Minnesota law,

> The [district] court may allow additional parenting time to a parent to provide child care while the other parent is working if this arrangement is reasonable and in the best interests of the child, as defined in section 518.17, subdivision 1. In addition, the court shall consider:
>
> > (1) the ability of the parents to cooperate;
> >
> > (2) methods for resolving disputes regarding the care of the child, and the parents' willingness to use those methods; and
> >
> > (3) whether domestic abuse . . . has occurred between the parties.

Minn. Stat. § 518.175, subd. 8 (2014). Thus, when considering a request for additional parenting time for child care under section 518.175, subdivision 8, the district court must evaluate the best-interests factors set forth in section 518.17, subdivision 1 (2014).[1] The district court's findings here reflect its consideration of both the best-interests factors under Minn. Stat. § 518.17, subd. 1, and the additional factors under Minn. Stat. § 518.175, subd. 8.

---

[1] The best-interests factors were amended in 2015. *See* 2015 Minn. Laws ch. 30, art. 1, § 3, at 271-73. We apply the pre-amendment best-interests factors because the legislature demonstrated its intent to change the best-interests factors by completely replacing the factors in the amendment and because the legislature did not provide that the amendment applies retroactively. *See* Minn. Stat. § 645.21 (2014) ("No law shall be construed to be retroactive unless clearly and manifestly so intended by the legislature."); *see also Braylock v. Jesson*, 819 N.W.2d 585, 588 (Minn. 2012) ("When the Legislature merely clarifies preexisting law, the amended statute applies to all future or pending litigation. If, on the other hand, the amendment changes preexisting law, the amendment is not retroactive unless the Legislature states otherwise." (citations omitted)).

The district court relied on the custody evaluator's report, which contains a detailed analysis of the best-interests factors under section 518.17, subdivision 1. The court found that "there appears to be an open and loving relationship between both parents and their children." This finding reflects "the intimacy of the relationship between each parent and the child[ren]," *see* Minn. Stat. § 518.17, subd. 1(a)(4), as well as "the capacity and disposition of the parties to give the child[ren] love, affection, and guidance," *see id.* subd. 1(a)(10).

The court also found, however, that "[t]he parties have an extremely contentious relationship" and that "at this time, the ability of the [parties] to cooperate is tenuous at best." The court found that "[e]ach parenting exchange is difficult for the parties and the children," that "[appellant] appears to be unable to refrain from disparaging [respondent] in the presence of the children," that "[w]hen [the parties] communicate with one another directly, the conversation often becomes argumentative," and that "[appellant] in particular appears to be unable to resist the urge to lash out." In addition, the court found that "[appellant's] motive in this matter is further clarified by her statement that she 'didn't bring two kids into the world to have them only 50% of the time.'" These findings are supported by respondent's testimony, the custody evaluator's testimony and report, and appellant's email to respondent stating that "[e]ven while trying to 'fake' being a dad it's still obvious that you never put those kids first." These findings reflect the inability of the parties to cooperate, *see* Minn. Stat. § 518.175, subd. 8(1), as well as "the disposition of each parent to encourage and permit frequent and continuing contact by the other parent with the child[ren]," *see* Minn. Stat. § 518.17, subd. 1(a)(13).

10

The district court concluded that, "[t]aking into account the best interests of the children, including a need to lessen their exposure to conflict between the parties, . . . at the present time it is not in [the children's] best interests for [appellant] to provide daycare services while [respondent] is working." The district court made appropriate findings on the best-interest factors that are supported by the record. We therefore conclude that the district court did not abuse its discretion by denying appellant's request for additional parenting time under Minn. Stat. § 518.175, subd. 8.

**Affirmed.**