*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0147**

In re the Marriage of:
Elena Vladimirovna Tokarev, petitioner,
Respondent,

vs.

Vladimir Efimovich Tokarev,
Appellant.

**Filed January 30, 2017
Affirmed
Bratvold, Judge**

Ramsey County District Court
File No. 62-FA-13-1768

D. Patrick McCullough, McCullough & Associates, P.A., St. Paul, Minnesota (for respondent)

Mark A. Olson, Olson Law Office, Burnsville, Minnesota (for appellant)

Considered and decided by Stauber, Presiding Judge; Worke, Judge; and Bratvold, Judge.

## U N P U B L I S H E D   O P I N I O N

**BRATVOLD**, Judge

Appellant-husband challenges the district court's factual findings regarding its temporary spousal-maintenance award to respondent-wife in the dissolution decree.

Husband also challenges the district court's subsequent order amending the decree to provide for permanent spousal maintenance. Because the district court's factual findings are not clearly erroneous, and the district court did not abuse its discretion by amending the decree to provide for permanent spousal maintenance, we affirm.

## FACTS

In 1985, husband and wife were married. In 1993, the parties moved from Russia to the United States for husband's career. They first lived in Pennsylvania for ten years and then moved to Minnesota in 2003. The parties have a 13-year-old minor son and a 29-year-old adult son. The parties enjoyed a comfortable standard of living during the marriage. They lived in a 3,500 square-foot home and owned an unencumbered one-bedroom condominium; they also accumulated retirement funds and savings, took family vacations, belonged to a health club, and their children played hockey.

On May 31, 2013, after 27 years of marriage, wife petitioned to dissolve the marriage. Wife moved out of the family home on November 3, 2013, because there was "tremendous stress" while the parties were living together. Wife moved into the parties' condominium and continued to live there throughout the dissolution proceedings; husband remained in the family home.

Before trial, husband and wife entered into a partial stipulation, which the court accepted and incorporated into the dissolution decree. In the stipulation, the parties agreed to equally split parenting time and custody of their minor child; they also agreed that the final decree would award wife the condominium and husband would sell the family home. In the dissolution decree, the district court ordered husband to pay wife $181 per month in

basic child support until their youngest child reaches the age of 18 or graduates high school.

The district court held a two-day court-trial to determine the remaining issues, specifically: the ability of the parties to bring their minor child to Russia, spousal maintenance, and division of the parties' assets and debts. Only spousal maintenance is at issue in this appeal.

At trial, husband and wife each testified and submitted evidence relating to spousal maintenance. In summary, wife is 51 years old and employed full-time at a call center earning $13 per hour. Wife is physically and mentally healthy and capable of working a full-time job. Husband is 52 years old and employed as a contract software engineer earning an annual salary of $112,000. Throughout the marriage, husband was the primary wage earner for the family. On appeal, husband challenges the district court's determinations of wife's income, the parties' expenses, and permanency of maintenance. The district court record on each of these determinations is summarized below.

*Wife's Income and Work Experience*

In 1986, wife graduated from Siberian State Industrial University with a four-year degree that is the equivalent of a U.S. bachelor's degree in engineering. After graduating, wife was employed in Russia for eight years as an economist at a government medical institute.[1]

In 1993, the parties left Russia and moved to Pennsylvania for husband's career. The district court found that wife's foreign degree "has not translated into marketable skills

---

[1] Husband testified that, in 1991, wife completed courses in business management, marketing, and advertising in Russia, but the district court credited wife's testimony that she never completed those courses.

during her work history." Between 1993 and 1995, wife did not have a visa permitting her to work in the United States. After obtaining a visa in 1995, wife returned to the workforce, working part-time in retail during the holiday season. In November 1997, wife completed 60 hours of real estate training courses, but did not take or complete the state licensure exam. Wife has not been employed as an economist or engineer while living in the United States.

From 1998 to 2001, wife worked 30 hours per week as a receptionist at a real estate franchise, earning approximately $1,032 per month. From 2001 to 2003, wife worked part-time as a customer service representative at a medical research firm earning approximately $1,084 per month.

In 2003, the parties moved to Minnesota for husband's career. Between 2003 and 2013, wife stayed at home to raise the two children. During this time, wife assisted husband with running an in-home computer sales company, called Web Ideas International.[2] Web Ideas sold U.S. computer equipment to buyers in Russia. The parties disputed wife's responsibilities at Web Ideas. It is undisputed that wife performed secretarial and administrative tasks, such as "taking orders, answering customer questions, [and] packaging the components and delivering them to FedEx for delivery." Wife also provided translation services to Web Ideas customers. Wife is bilingual in Russian and English, but she is not a certified interpreter or translator, nor is she qualified to interpret or translate in any particular field.

---

[2] After wife petitioned to dissolve the marriage, the parties abandoned the business.

4

After hearing conflicting testimony on the extent of wife's involvement in Web Ideas, the district court found that husband overstated wife's involvement and wife understated her contribution to the business. In addition to secretarial and administrative tasks, the district court determined that wife was involved in day-to-day correspondence with customers. But the district court also found that wife did not have the expertise to develop the business's software or handle complicated customer questions. The district court specifically credited wife's testimony that "there were parts of the business [that wife] had no answers to."

In 2013, wife reentered the workforce outside of the home. Wife held a series of part-time hourly jobs until October 2013 when she obtained full-time employment as a sales consultant earning $1,950 per month but was later terminated. In November 2014, wife obtained new full-time employment as a call center representative earning $13 per hour where she remained employed during trial.

The parties submitted conflicting versions of wife's resume. The district court found that husband's version contained inaccuracies and inflated wife's educational and work history.[3] Each party also submitted a vocational report assessing wife's potential earning capacity. Wife's report was prepared by Greta Bormann, who concluded that wife was

---

[3] In particular, the district court determined that husband's version states that: (a) wife worked as an accountant in Russia, but she was "an economist whose duties involved future spending"; (b) wife worked as a real estate secretary, but she was a receptionist at a real estate franchise; (c) wife was employed as an assistant research technologist at a medical research firm in Pennsylvania, but she was a customer service representative; (d) wife was a personal banker in Pennsylvania, but wife testified that she was a bank teller; and (e) wife worked at Web Ideas as a bookkeeper, but husband admitted in his testimony that he helped wife prepare the business's tax returns.

qualified for entry-level positions earning between $14 and $15 per hour. Bormann opined that wife is not qualified for a career in the economics field because she does not have the necessary work experience, education, or advanced knowledge in accounting systems and Microsoft Office. Bormann suggested that wife could improve her earning capacity by taking additional courses.

Husband originally hired Bormann, but before Bormann produced her written report, husband told her that he would not accept her report or compensate her. Over husband's objection, wife obtained a district court order allowing her to pay for Bormann's report and offer it at trial. The district court found husband's testimony "evasive" when he was asked at trial whether he knew Bormann's opinions before deciding that he would not accept her report.

Husband's vocational analyst was Mark Raderstorf, who concluded that wife is qualified to work as an interpreter/translator or customer service representative. According to Raderstorf, interpreters earn between $11.39 and $28.79 per hour, and customer service representatives earn between $10.99 and $25.84 per hour. Raderstorf concluded that wife could earn $20 per hour as an interpreter and $17 per hour as a customer service representative. Raderstorf recommended that wife take computer courses and use her language skills more often in the workplace.

The district court found Raderstorf's vocational assessment unreliable because it was based on inaccurate information.[4] Additionally, the district court determined that

---

[4] The district court identified the following inaccuracies in Raderstorf's report: (1) he relied on husband's version of wife's resume; (2) he stated that wife had a Pennsylvania Realtor

6

Raderstorf overstated wife's ability to earn $20 per hour as an interpreter because she is not a certified interpreter and Raderstorf failed to take into account other variables, such as the demand for interpreters. The district court found it "significant" that when wife worked outside of the home during the marriage, her jobs were entry-level positions.

### Reasonable Living Expenses

Husband and wife agreed in their testimony that they cannot sustain their standard of living after the divorce and will need to cut back on expenses because there is insufficient income to meet each party's expected expenses. Each party submitted a proposed budget. Husband estimated that his monthly living expenses were $6,476, which included $2,774 for housing expenses. Husband testified that, after selling the family home, he intended to rent an apartment, which he expected would decrease his monthly housing expenses by $500.

Wife estimated that her monthly living expenses were $6,762. Although wife did not have a mortgage at the time of trial, she included $2,546 in her proposed budget for a monthly mortgage payment. Wife testified that she would like to move out of the condominium because it is not large enough for her and her teenage son.[5] Wife testified

---

Certificate, but wife only completed a real estate course and did not have a real estate license; (3) he stated that wife was an accountant in Russia, but she was an economist; and (4) he stated that wife "has found success in her current position," but wife had been terminated when Raderstorf completed his assessment.

[5] The parties stipulated to a statement from a realtor who was helping wife find a home. The stipulation states that wife will not qualify for a mortgage until after she begins receiving spousal maintenance.

that, on nights when her son stays with her, she sleeps on the couch and her son sleeps in the bedroom.

At trial, husband submitted a report from a private investigator who reported that, on three nights in January and February 2014, wife did not sleep at her condominium. From this, husband argued that wife was cohabiting. Wife, however, testified that she spends most nights at the condominium.

### Temporary Maintenance Award

On March 30, 2015, the district court entered its findings of fact and conclusions of law in the dissolution decree. Relevant to this appeal, the district court determined that wife was entitled to spousal maintenance because she "lacks sufficient property and earning capacity to provide [for] her adequate self-support, after considering the standard of living established during the marriage" and awarded wife $2,400 in temporary monthly spousal maintenance.

The district court's maintenance determination was based on its income and expense findings. The district court found that husband's gross monthly income is $9,333 based on his gross annual salary of $112,000. The district court concluded that wife was underemployed when earning $13 per hour, and imputed income to wife in the amount of $17.64 per hour, which equals $3,058 gross monthly income.[6] Applying a 22% tax

---

[6] Wife's imputed income is at the low end of Raderstorf's interpreter salary range, which the district court found was appropriate because wife is not a certified interpreter and has no expertise interpreting in a particular industry. The imputed income is in the midrange of Raderstorf's customer service representative salary range, which the district court found is consistent with wife's current and past work experience. The district court also determined that wife could increase her earning capacity by becoming a certified

8

deduction rate, the district court determined that wife's imputed net monthly income is $2,385.

Regarding expenses, the district court determined that, although wife did not have a mortgage, her "move into the parties' condominium [was not] a determination on her part that she will permanently live in a condominium." Thus, the district court determined that it was reasonable to include a mortgage payment in wife's budget. Noting that each party's proposed budgets were similar to the other, the district court equalized the parties' monthly budgets at $5,905.

Using its income and expense findings, the district court compiled tables calculating the parties' after-tax incomes available to meet their reasonable needs. In the tables, the district court incorporated the monthly spousal maintenance and child-support payments into the parties' gross monthly incomes and reduced gross income by the parties' estimated tax liability. In calculating the parties' estimated tax liability, the district court used the tax information provided by husband in the exhibits he submitted to the district court.

Based on the cash flow analysis in the tables, the district court concluded that there is insufficient income to meet the reasonable needs of both parties. Thus, the district court noted that the parties will have to "share the pain" in reducing their expenses and adjusting their standards of living. The district court concluded that husband could afford to pay wife $2,400 in monthly maintenance to help wife meet her needs while still being able to meet his own needs. The decree stated that the maintenance award would terminate upon the

interpreter, but such an increase in earnings would still be insufficient for wife to meet her needs independently.

9

minor child turning age 18, "or [continue] as long as the minor child is still attending secondary school and is under the age of 20 whichever is later."

### *Amended Permanent Maintenance Award*

Both parties moved for amended findings or a new trial. Each party raised several arguments. Relevant to this appeal, wife requested that the temporary spousal maintenance award be amended to a permanent award because Minn. Stat. § 518.552, subd. 3, requires a permanent award if there is any uncertainty of the need for permanent maintenance.

At the hearing, the district court orally granted wife's motion for permanent spousal maintenance, explaining: "I do believe that the duration of the maintenance is a mistake on my part, I think there is a defect. I'm not sure what my thinking was when I included that language where it would end when your child reaches the age of majority." The district court stated that it had reviewed wife's budget and determined that, even after the child leaves the home and wife stops receiving child-support payments from husband, wife will be unable to meet her needs independently. Accordingly, the district court concluded that wife's ability to meet her needs "is speculative." The district court added that "the two of you can take a look at it at the situation there and it may be that there is no need for maintenance at that time. But I need [to] err on the side of permanent maintenance."

The district court's order amended the decree and clarified that its findings of fact predicting wife's ability to meet her future needs were "speculative, at best." The district court explained that it had erred in awarding temporary maintenance because section 518.552, subdivision 3, mandates a permanent maintenance award if there is uncertainty as to the necessity of a permanent award.

The parties filed new motions for amended findings or a new trial, raising several arguments. Relevant to this appeal, husband requested that the district court reinstate the temporary spousal maintenance award. After a hearing, the district court denied husband's motion for temporary maintenance on November 23, 2015. Husband's appeal follows.

## D E C I S I O N

We review a district court's spousal-maintenance award for an abuse of discretion. *Erlandson v. Erlandson*, 318 N.W.2d 36, 38 (Minn. 1982). A district court abuses its discretion "by making findings unsupported by the evidence or by improperly applying the law." *Dobrin v. Dobrin*, 569 N.W.2d 199, 202 & n.3 (Minn. 1997) (quotation omitted). We apply "a clearly erroneous standard of review to a district court's findings of fact concerning spousal maintenance." *Maiers v. Maiers*, 775 N.W.2d 666, 668 (Minn. App. 2009). "Findings of fact are clearly erroneous where an appellate court is left with the definite and firm conviction that a mistake has been made." *Goldman v. Greenwood*, 748 N.W.2d 279, 284 (Minn. 2008) (quotation omitted). In reviewing the record under the clearly-erroneous standard, this court views the evidence in the light most favorable to the district court's findings. *Vangsness v. Vangsness*, 607 N.W.2d 468, 474 (Minn. App. 2000). We defer to the district court's credibility determinations *Sefkow v. Sefkow*, 427 N.W.2d 203, 210 (Minn. 1988).

## I. Income Calculation

"A district court's determination of income for maintenance purposes is a finding of fact and is not set aside unless clearly erroneous." *Peterka v. Peterka*, 675 N.W.2d 353, 357 (Minn. App. 2004). This court reviews the district court's consideration of the parties'

11

tax liability in calculating income for an abuse of discretion. *Maurer v. Maurer*, 623 N.W.2d 604, 608 (Minn. 2001). But if a district court bases its award on the maintenance-seeking spouse's reallocation of assets to create income, it must consider the tax consequences of the award. *Curtis v. Curtis*, 887 N.W.2d 249, 255–56 (Minn. 2016). The district court does not abuse its discretion in considering tax liability if it had "a reasonable and supportable basis for making an informed judgment as to [the] probable liability." *Id.* (alteration in original) (quotation omitted).

In challenging the district court's income calculations, husband argues first that the gross income imputed to wife does not reflect wife's full potential earning capacity because "with a little effort, wife can certainly make more money than what the trial court imputed to her." As support, husband overstates wife's involvement in Web Ideas, quoting his own testimony that wife was the "principal operating person" of the company. But the district court found that wife's assistance with the business was limited to "day-to-day correspondence [and] communication with customers." The district court also specifically credited wife's testimony that there were questions about the business that she could not answer without husband's help. We will not disturb the district court's credibility determinations on appeal. *Sefkow*, 427 N.W.2d at 210.

Husband also asserts that wife's imputed income should rely on Raderstorf's vocational assessment, which concluded that wife could earn more than $17.64 per hour. But the district court found that Raderstorf's assessment of wife was based on inaccurate information provided by husband. The district court's detailed findings on the appropriate

12

amount of income to impute to wife are supported by the record, and we will not usurp the district court's role as factfinder. *Dobrin*, 569 N.W.2d at 202.

Second, husband contends that the district court improperly calculated the parties' tax liability in making its income determinations. But the decree includes cash flow tables that incorporate the spousal maintenance and child-support payments in the parties' gross incomes and deduct the parties' expected tax liability from their gross incomes to calculate after-tax income. Notably, the district court used the tax information provided by husband in estimating the parties' tax liability.[7]

Third, husband argues that the district court erred by not calculating the parties' net income. *See* Minn. Stat. § 518.552, subd. 2(g) (2016) (requiring the district court to consider the payor spouse's ability to meet needs while meeting the recipient spouse's needs); *Kostelnik v. Kostelnik*, 367 N.W.2d 665, 670 (Minn. App. 1985) ("In order to determine ability to pay, the [district] court must make a determination of the payor spouse's net or take-home pay."), *review denied* (Minn. July 26, 1985). Husband's argument is without merit because the district court calculated the parties' net incomes in the cash flow tables by reducing their gross incomes by their expected tax liability.

_____

[7] Husband claims that the district court "ignored its own admonishment that it would not speculate by employing imprecise estimates." During trial, the district court stated that it would consider leaving the record open so that the parties could submit additional tax information. But in the decree, the district court declined to hold the record open for additional tax information because "there is sufficient information about the tax consequences and cash flow," and any imprecision in its tax calculations "would be so insignificant that it would not impact [] the final decision." The district court did not abuse its discretion because it was not required to hold the record open for additional tax information.

13

Additionally, the district court expressly found that wife's net imputed monthly income is $2,385. The district court did not clearly err in calculating the parties' incomes.

## II. Expense Calculation

The district court's calculation of a party's reasonable expenses "must be upheld unless clearly erroneous." *McCulloch v. McCulloch*, 435 N.W.2d 564, 566 (Minn. App. 1989). This court must remand to the district court if it does not make specific findings of the parties' reasonable expenses. *Stich v. Stich*, 435 N.W.2d 52, 53 (Minn. 1989).

After considering each party's proposed budget, the standard of living maintained during the marriage, and the uncertainty surrounding the parties' future housing expenses, the district court assigned $5,905 to each party's monthly budget. The district court calculated this number by giving each party a monthly housing budget of $2,274, which is $500 less than the amount husband spent on housing expenses while living in the family home. The district court calculated the housing budget based on husband's testimony that his housing expenses would be $500 less after selling the family home. Based on this housing budget, wife's total monthly budget was reduced from $6,762 to $5,905.

The district court explained its reasoning for equalizing the parties' budgets:

> The Court is aware and reminds the parties that predicting budgets is not a precise exercise, especially when so much of the proposed budgets will be determined by future decisions where and how each party will live. Indeed, since this case is one where there is not sufficient income to meet all of the reasonable needs of each party given their standard of living during the marriage, less focus on each line item in the budget is warranted. By clarifying what the monthly budget should be, the parties will be able to make individual decisions in their own lives.

14

In challenging the district court's expense calculations, husband advances three contentions. First, husband contends the district court failed to consider evidence of wife's cohabitation, which should have reduced her budget.[8] The district court expressly declined to make findings regarding wife's cohabitation, concluding that the evidence of cohabitation was only "marginally relevant for issues involving [wife's] budget and her income capacity." The district court nonetheless determined that, even if wife "spends a significant amount of time with her significant other, [there is no] evidence [] this practice will continue in the long term." The district court's decision not to consider wife's cohabitation in calculating her expenses was not clearly erroneous because husband's private investigator monitored wife for only three nights in early 2014 and there is no evidence that any alleged cohabitation affected wife's living expenses.

Second, husband argues that the district court erred by including $2,274 in wife's budget for a mortgage when she does not have a mortgage. The district court determined that wife's move into the condominium was not "a determination on her part that she will permanently live" there because she was forced "to leave and make arrangements for a temporary living situation" due to the "tremendous stress" when husband and wife lived together in the family home. The parties stipulated to evidence from wife's realtor that wife

_____

[8] In 2016, the legislature enacted Minn. Stat. § 518.552, subd. 6 (2016), which provides four factors for determining whether a maintenance recipient's cohabitation with another adult warrants maintenance modification. We note that subdivision 6 only applies to maintenance modification motions, not to the original award. Additionally, because the new statutory provision did not go into effect until August 1, 2016, neither the parties nor the district court considered the four cohabitation factors. 2016 Minn. Laws ch. 132, § 1, at 1. Accordingly, we do not address subdivision 6.

was searching for a home and would be unable to obtain a mortgage until husband began paying spousal maintenance. Wife also testified that she intended to purchase a home and move out of the condominium after trial because it was too small for her and their teenage son to live in. Additionally, the district court noted that wife's 400-square foot, one-bedroom condominium does not reflect the standard of living during the marriage.

For the first time on appeal, husband asserts that county records show that the condominium is 668 square feet, which is 67% larger than the size stated in the district court record. Husband also claims that county records show that wife continues to live in the condominium and she has recently homesteaded the condominium. Husband requests that this court take judicial notice of these county records. "A court shall take judicial notice if requested by a party and supplied with the necessary information." Minn. R. Evid. 201(d). Appellate courts may take judicial notice of public records even if they were not presented in the district court because appellate courts "have the inherent power to look beyond the record where the orderly administration of justice commends it." *Eagan Econ. Dev. Auth. v. U-Haul Co. of Minn.*, 787 N.W.2d 523, 530 (Minn. 2010) (quotation omitted); *see also* Minn. R. Evid. 201(c) ("A court may take judicial notice, whether requested or not.").

We decline husband's request to take judicial notice of the county records for two reasons. First, husband did not argue the size of the condominium in the district court and we do not consider issues raised for the first time on appeal. *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988). Second, our task in reviewing the district court's findings under a clearly erroneous standard of review is to determine whether the record supports the

16

findings. Regardless of whether the condominium is 400 square-feet or 668 square-feet, it pales in comparison to the standard of living during the marriage when the parties lived in a 3,500 square-foot home. Accordingly, the orderly administration of justice does not require that we take judicial notice of the county records, and we conclude that the district court did not clearly err by including a mortgage payment in wife's budget.

Third, husband argues that the district court erred by "arbitrarily" giving him the same budget as wife and requiring the parties to "share the pain." In deciding to equalize the parties' budgets, the district court explained:

> Both parties argued to the Court that the Court should require that they share the pain. The Court agrees. The Court's spousal maintenance award will help bridge a gap in [wife's] budget, but she will still be short each month unless she further reduces her expense or invades her property settlement. [Husband] will be left with approximately the same amount of cash to meet his monthly living expenses as [wife]. Both parties have experienced, and will continue to experience, a reduced standard of living in the near future.

As support, husband cites *Snyder v. Snyder*, in which the supreme court noted that "[t]he purpose of alimony is to care for the wife's needs after divorce, not to provide her with a lifetime profit-sharing plan." 298 Minn. 43, 53, 212 N.W.2d 869, 875 (1973) (quotation omitted). We conclude that *Snyder* is inapposite because it predates the current version of the maintenance statute. Further, there is no indication that the district court awarded maintenance in this case as a "lifetime profit-sharing plan." The district court carefully considered the current statutory factors for determining an appropriate maintenance award, and found that wife was unable to meet her needs independently based on her reasonable living expenses and earning capacity. The district court also determined

17

that husband has the ability to pay wife $2,400 in monthly maintenance while also supporting his own needs. Thus, the maintenance award in this case is consistent with *Snyder*'s instruction that "alimony is to care for the wife's needs after divorce."[9] Accordingly, the district court did not clearly err by assigning the same budget to each spouse.

### III. Permanent Spousal-Maintenance Award

"The maintenance order shall be in amounts and for periods of time, either temporary or permanent, as the court deems just, without regard to marital misconduct, and after considering all relevant factors," including eight specified factors. Minn. Stat. § 518.552, subd. 2. "[T]he support to which a divorced party is entitled is not simply that which will supply her with the bare necessities of life. Rather, the obligee can expect a sum that will keep with the circumstances and living standards of the parties at the time of the divorce." *Lee v. Lee*, 775 N.W.2d 631, 642 (Minn. 2009) (quotations and citation omitted). Minnesota law "leaves little room for the exercise of discretion where the need for permanent maintenance is in question." *Bolitho v. Bolitho*, 422 N.W.2d 29, 32 (Minn. App. 1988). "Where there is some uncertainty as to the necessity of a permanent award, the court *shall* order a permanent award leaving its order open for later modification." Minn. Stat. § 518.552, subd. 3 (emphasis added); *Nardini v. Nardini*, 414 N.W.2d 184, 197 n.10 (Minn.

---

[9] Husband also cites an unpublished decision to support his argument. Unpublished decisions are not precedent. Minn. Stat. § 480A.08, subd. 3 (2016); *Gen. Cas. Co. of Wis. v. Wozniak Travel, Inc.*, 762 N.W.2d 572, 582 n.2 (Minn. 2009). Also, this case is dissimilar to the unpublished decision because here, unlike in the unpublished decision, the district court analyzed all of the appropriate statutory factors in awarding maintenance.

18

1987) ("[T]emporary maintenance should not be favored over permanent awards"); *see also* Minn. Stat. § 645.44, subd. 16 (2016) ("'Shall' is mandatory.").

Husband does not dispute that wife is entitled to spousal maintenance. Rather, he argues that the district court abused its discretion by amending the spousal-maintenance award from temporary to permanent. The district court concluded that it should have awarded permanent maintenance because its findings in the original decree showed that wife's ability to meet her needs in the future was speculative.

The district court's findings of fact support its decision to amend the spousal-maintenance award. In the decree, the district court determined that wife is unable to meet her needs independently. The district court found that, based on wife's imputed income and reasonable living expenses, she would be $3,520 short each month if she did not receive spousal maintenance. The district court also found that, even if wife increased her earning capacity by obtaining additional training, she still would be unable to meet her needs independently. Notably, the district court determined that wife's earning capacity has been "permanently diminished" due to her outdated education and skills and her lack of seniority in the workplace as a result of leaving her prior jobs so that husband could pursue his career.

Additionally, the decree expressly found that predicting wife's ability to meet her needs after the child turns 18 and moves out of the house is "speculative, at best." Although it is possible that wife will fully rehabilitate and be able to support herself in the future, the district court did not abuse its discretion in awarding permanent maintenance because Minnesota law mandates a permanent award when there is "*some* uncertainty" as to the

recipient spouse's ability to support herself. Minn. Stat. § 518.552, subd. 3 (emphasis added); *see Musielewicz v. Musielewicz*, 400 N.W.2d 100, 104 (Minn. App. 1987) (noting that wife may be able to become self-supporting in the future, but "[a]s a matter of law," the district court was "required to make the maintenance award permanent"), *review denied* (Minn. Mar. 25, 1987); *Duffey v. Duffey*, 416 N.W.2d 830, 833 (Minn. App. 1987) (holding that district court should have awarded permanent maintenance because "[a]lthough appellant may be capable of securing employment, it is uncertain whether she can become fully self-supporting."), *review denied* (Minn. Feb. 24, 1988).

Husband nonetheless argues that the district court should have maintained the temporary maintenance award because the burden is on wife to demonstrate her efforts to rehabilitate. As support, husband cites three cases, none of which decided to overturn a permanent maintenance award. For example, *Nardini v. Nardini* held that "[a]n award of temporary maintenance is based on the assumption that the party receiving the award not only should strive to obtain suitable employment and become self-supporting but that he or she will attain that goal." 414 N.W.2d 184, 198 (Minn. 1987). But *Nardini* was an appeal of a district court's temporary maintenance award, whereas this is an appeal of a permanent maintenance award. Thus, there is no assumption that wife will attain the goal of becoming self-sufficient in the future. Also, *Nardini* reversed the district court's temporary award because it found that permanent maintenance was appropriate. *Id.* at 197–99. Similarly, the

district court awarded permanent maintenance in this case because it was uncertain whether wife could become self-sufficient in the future.[10]

We note that the district court's permanent maintenance award has the consequence of placing the burden on husband to establish changed circumstances if he seeks to terminate or reduce the award in the future. Minn. Stat. § 518A.39, subd. 2(a) (2016). But it can be presumed that the legislature was aware of this circumstance when it enacted Minn. Stat. § 518.552, subd. 3, favoring permanent awards over temporary awards when the spouse's ability to meet needs independently is uncertain.[11] *See Goodyear Tire & Rubber Co. v. Dynamic Air, Inc.*, 702 N.W.2d 237, 244 (Minn. 2004) ("In enacting statutes, we presume that the legislature acts with full knowledge of existing law."); *Poehls v. Poehls*, 502 N.W.2d 217, 218 (Minn. App. 1993) ("A designation of 'permanent maintenance' is a term of art which places the burden on the spouse obligor to demonstrate that a maintenance award should be lessened or terminated due to changed circumstances."); *see also Musielewicz*, 400 N.W.2d at 104 ("[T]he trial court [was] required to make the maintenance award permanent, leaving the burden with [the payor spouse] to seek any future decrease or termination of maintenance justified by a substantial

---

[10] Husband also relies on *Dobrin*, 569 N.W.2d 199, and *Maiers*, 775 N.W.2d 666, which we reject for the reasons discussed above.

[11] Before and after Minn. Stat. § 518.552, subd. 3, was adopted, the statute allowing modification of spousal maintenance placed the burden of proof on the moving party. Section 518.552, subdivision 3, was enacted in 1985. 1985 Minn. Laws ch. 266, § 2, at 1187. At that time, the law placed the burden on the moving party to establish changed circumstances to modify a maintenance obligation. 1978 Minn. Laws ch. 772, § 59, at 1087; *see also Abuzzahab v. Abuzzahab*, 359 N.W.2d 329, 332 (Minn. App. 1984) ("[T]he moving party must demonstrate both a substantial change in income or needs and unfairness caused by that change.").

change in the circumstances of either party."). Accordingly, we conclude that the district court did not abuse its discretion by awarding wife permanent spousal maintenance.

**Affirmed.**